UNITED STATES FIDELITY & GUARANTY CO. v. DES MOINES NAT.
BANK OF DES MOINES, IOWA.

(Circuit Court of Appeals, Eighth Circuit.    March 16, 1906.)

No. 2,200.

1. EMPLOYER'S INDEMNITY BOND—DEGREE OF CARE TO BE EXERCISED BY EM-
PLOYÉ—INSTRUCTION TO JURY.

In an action upon a bond whereby a guaranty company agrees to make
good and reimburse to an employer any pecuniary loss sustained by him
through the personal dishonesty or culpable negligence of an employé in
connection with the duties of his employment, and wherein "culpable
negligence" is defined to mean "failure to exercise that degree of care
and caution which men of ordinary prudence and intelligence usually
exercise in regard to their own affairs," it is error to instruct the jury
that the degree of care and caution, failure to exercise which on the
part of the employé will render the guaranty company liable for a re-
sultant loss, is "the very highest, you might almost say the highest pos-
sible," "the very highest," and "an extraordinary and a very high degree."

2. EVIDENCE—AN INFERENCE OF FACT CANNOT BE DRAWN FROM PREMISES
WHICH ARE UNCERTAIN.

An inference of fact cannot be legitimately drawn from a rebuttable
presumption, but only from premises which are certain.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §§
2444, 2445.]

3. SAME—CIRCUMSTANTIAL EVIDENCE CONSISTENT WITH EITHER OF TWO OP-
POSING THEORIES PROVES NEITHER.

A theory cannot be said to be established by circumstantial evidence,
even in a civil action, unless the facts relied upon are of such a nature,
and are so related to each other, that it is the only conclusion that can
fairly or reasonably be drawn from them.    If the facts are consistent
with either of two opposing theories, they prove neither.

[Ed. Note.—For cases in point, see vol. 20, Cent. Dig. Evidence, §
2436.]

4. NEGLIGENCE WHEN ACTIONABLE—PROXIMATE CAUSE OF LOSS OR INJURY.

Negligence is actionable only when loss or injury proximately results
therefrom, and to be thus proximate the loss or injury must be a natural
and probable consequence which ought to have been foreseen or reason-
ably anticipated in the light of the attendant circumstances.

[Ed. Note.—For cases in point, see vol. 37, Cent. Dig. Negligence, § 72.]

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Southern
District of Iowa.

J. L. Parrish (R. L. Parrish and C. C. Dowell, on the brief), for
plaintiff in error.

Charles L. Powell (W. L. Read, on the brief), for defendant in
error.

Before VAN DEVANTER and HOOK, Circuit Judges, and
LOCHREN, District Judge.

VAN DEVANTER, Circuit Judge. The Des Moines National
Bank of Des Moines, Iowa, recovered in the Circuit Court against the
United States Fidelity & Guaranty Company, a Maryland corporation,
a verdict and judgment in the sum of $5,000, with interest, upon a

145 F.—18

bond whereby, subject to the conditions therein contained, the guaranty company agreed to make good and reimburse to the bank any pecuniary loss sustained by it through "the personal dishonesty or culpable negligence" of Elton C. Kelley, its receiving teller, in connection with the duties pertaining to that position, "and for which the employé shall be legally liable to the employer." To secure a reversal of that judgment the guaranty company sued out this writ of error.

One of the conditions of the bond was this:

"The company shall not be liable hereunder for any loss occasioned by mistake, accident, error of judgment on the part of any employé, or any robbery, unless by or with the connivance or culpable negligence of the employé; and 'culpable negligence,' as used in this bond, shall be taken and held to mean failure to exercise that degree of care and caution which men of ordinary prudence and intelligence usually exercise in regard to their own affairs."

In different portions of the court's charge to the jury the degree of care and caution, failure to exercise which constitutes culpable negligence within the meaning of the bond, was declared to be "the very highest, you might almost say the highest possible," "the very highest," and "an extraordinary and a very high degree." This was excepted to at the time and is assigned as error. The exception was well taken. The terms of the contract, which were perfectly plain, did not call for the exercise by the employé of the very highest or an extraordinary degree of care and caution, but only such as men of ordinary prudence and intelligence usually exercise in regard to their own affairs. That the two things are not substantially the same, but essentially different, and that the charge conveyed to the jury an enlarged idea of the right of the bank and of the obligation of the guaranty company, are self-evident propositions.

Error is also assigned upon the court's refusal, at the conclusion of the evidence, to direct a verdict for the guaranty company; the contention being that there was no evidence that Kelley was personally dishonest, or that the loss sustained by the bank was occasioned by his negligence and was one for which he was legally liable to his employer. The evidence was without conflict and may be summarized as follows:

Kelley was the receiving teller of the bank, Collins was its paying teller, and Zwart was its cashier. It was part of Kelley's duties as receiving teller to take the place and to perform the duties of the paying teller during the temporary absences of the latter. Collins was absent on his annual vacation from Saturday evening, August 9th, until Monday morning, August 25, 1902, and his place was filled by Kelley from Monday morning, August 11th, until Saturday evening, August 23d. As temporary paying teller, Kelley was chiefly engaged during business hours in paying out money on checks. His place of work was separated from other portions of the bank by wire partitions and iron frames forming a sort of cage, which was distant about 30 feet from the general vault in which were kept the books, files, and papers of the bank, and a safe for the safekeeping

of the cash. Three or four other employés worked at stations between the paying teller's cage and the vault. The safe had two compartments; one called the "reserve chest," in which was kept the reserve cash not ordinarily required for immediate use, and another in which was kept what was termed the "counter cash." By the custom of the bank the counter cash was taken by the paying teller from the safe to his cage in the morning of each business day and was returned in the evening, but the reserve cash remained in the safe during business hours as well as at other times. As occasion required, the counter cash was replenished from the reserve cash, and, when the amount of the former became too large, it was reduced by transferring part of it to the latter. The outer door of the safe was equipped with a time lock and the reserve chest was equipped with a separate lock. The combination to the latter was in the possession of the president, Zwart, and Collins, but was not given to Kelley. The president and Collins were absent during Kelley's service as paying teller, and when it was necessary for him to have access to the reserve cash, which was almost of daily occurrence, Zwart, who was then the managing officer of the bank, would unlock the reserve chest and leave it in that condition for the remainder of the day. In this way the reserve cash was made also accessible to the other employés—and there were several of them—who had frequent occasion to go into the vault for books, files, and papers. When Kelley was at lunch during the noon hour his place was filled by another employé. At the close of business hours, whatever money had been taken in by other employés during the day was turned over to Kelley as part of the counter cash, and it was then part of his duties to count the counter cash, to place it in the proper compartment of the safe, to count the money in the reserve chest, and to make appropriate entries upon his books of the amount and character of the cash on hand. He would then lock the reserve chest—which he could do, although he did not have the combination—and would also set the time lock on the outer door of the safe. When he assumed the duties of paying teller, the money in the reserve chest, as also the counter cash, was counted by him or in his presence, and was found to correspond in amount and character with what was called for by the books. During his service in that station he regularly performed its duties, save that, although instructed so to do, he did not make a daily count of the money in the reserve chest. Instead of that he kept an account of the original amount in that chest and of all amounts taken therefrom or placed therein by him, and at the close of each business day used the amount shown by that account to be in the reserve cash in balancing his books. On Saturday evening, August 23d, after counting the counter cash and placing it in the safe as usual, he locked the safe, entered in his books the amount and character of the cash on hand, and left on a vacation, as had been before arranged. On Monday morning, August 25th, Collins resumed his station as paying teller, and, on counting the money in the safe, found that the counter cash corresponded with the books and with Kelley's entries, but found that there was $5,000 less paper currency in the reserve cash than was called for by

the books and by the account kept by Kelley. Kelley returned and assisted in the investigation which followed. There were no errors in bookkeeping which accounted for the loss. ·It was actual. Zwart,. Kelley, and the employé who filled the latter's place during the noon hour each testified that he did not take the money. When or how the loss occurred, or what became of the money, was not more definitely shown than has been stated. In that connection it is well to. refer to the following testimony, even though it involves some repetition:

Reynolds, the president of the bank, says:

"This shortage was discovered on the 25th of August. 1902. I did not return until two or three days afterwards. When I did return Kelley was there. Considerable examination was made of the books of the bank with reference to this shortage. We all had more or less to do with the same. It run through a period of perhaps a month. Mr. Kelley participated in the examination. He was given every opportunity to make an examination. I assisted some in it. 'No discovery was ever made of what became of the money, nor has it ever been paid back to the bank by any one. * * * In this investigation there was nothing to indicate what did become of the money. We did not discover anything. Q. There was nothing to indicate that Mr. Kelley got the money more than any one else? A. We do not know what became of it. In this vault in which this safe was located was contained all the other paraphernalia, business files, letter files, books, and other things, books of collection and everything that was used there from day to day and hour to hour, except what. might be stored away for safe-keeping * * * Q. Now, these various clerks and bookkeepers and tellers you refer to had occasion to, and did continuously, go in and out of this vault here in which this safe was contained? A. Oh, yes; they were going in and out for anything they wanted. Q. They went in after their· books, collections, and any papers that they wanted to use in the bank? A. Yes, sir; they would go into the vault and get it. Q. They went back and forth past the door of the safe, did they not? A. Yes, sir; * * * I did not find anything in making this examination as to the shortage, except we found that the shortage was located in his (Kelley's) department by his own books. The other employés who had access to the vault did not keep anything in the safe, and had no right under their employment to go into this safe."

Zwart, the cashier, says:

"No one except the paying teller, or the one acting as paying teller, had any business in that safe in the ordinary conduct of the business of the bank. The duties of the other employés did not permit or require them ever to go to that safe for anything. * * * I took off the combination so that he (Kelley) or any one else could open the reserve chest, and then I went back and told him it was open, and after that, when he had occasion to go back at any time and get money, he went back and got it during that day, unless he locked it again. I do not know whether he would lock it again until night. He would have to take the cash out of the reserve chest to count it—that was my instructions to him—at the close of business each day, and he certainly could not count it if he did not have access to it. Q. So that it was your expectation after you opened it in the morning it would· remain open during the day? A. That must have been actually the case. Q. Do you know that was being done? A. It had to be that way. * * * These various employés who were working there had free access to that safe. They passed right by this door by [of] the reserve chest as they passed in and out. Any one of them might have opened that door to the reserve chest after I left it in the morning, if they knew how. There was nothing to do but to throw the bolts, swing the handle, and pull the door open. I think any ordinary bank clerk would know enough to do that. * * * I always found the combination on when I was called upon to

open it in the morning. * * * He (Kelley) had to call on me because I had the combination. He did not. It was then his duty, after I had unlocked the reserve chest, to take out from time to time such money out of the reserve chest as he might need in the conduct of his business as paying teller. His position was in the paying teller's cage paying money out to different parties, and he simply, when he got short of money, went back to the vault and got it out of the reserve chest."

Owen, the general bookkeeper, whose desk was nearest to the vault door, says:

"I worked with my back to the vault, two or three feet further east than the door. I did not intend to keep watch of the employés who went in and out of the vault. I did not pay any attention to the employés."

Kelley says:

"My present occupation is that of teller in the Iowa National Bank. I am 28 years of age. I have been working for banks here in Des Moines for about eight years. * * * When I went back to get money out of this reserve chest during these days, I always found it closed. The combination is what they turn on the last number. All you have to do is to turn just a trifle and it would open itself. It was so that any one could open it. That is the condition in which I found it each day when I went back to get money out of the reserve chest. If I took any out I would make the proper entry on the book. The same way, if I had too much on hand and put it in the reserve chest, I would add to it. * * * At the close of business each day I used the total I had on that book to balance by. * * * Everybody had access to that safe; that is, it was always left in such condition that anybody that wanted to could open it. The outside safe was open, as I said before, but the reserve chest was left in such a condition that anybody could open it readily. The other employés in the bank had access to the vault and passed in and out. They had always done that during all the time I had been there. They passed right by the door of this safe in which the money was kept."

The only evidence that it was known at any time before the discovery of the loss that Kelley was not making a daily count of the reserve cash was this: Zwart, the cashier, testified:

"I do not know how the question came up, but he told me he did not count the money in the reserve chest at the close of business each day, but he showed me the book in which he kept track of the amount he put into that department, and the amount he took out. I told him that was not a safe way to balance the cash at night; that he must inventory that cash at night when he balanced. I told him this as soon as I discovered that he was keeping this memorandum instead of making this count, which was the second or third day that he was acting in Collins' absence. I do not know whether he continued to count the cash after that. * * * I supposed all the time he was counting the cash at night."

And Wellslager, a bookkeeper, testified:

"I overheard Mr. Zwart make some remark to Kelley, while Kelley was acting as paying teller in Mr. Collins' absence on vacation, about counting his cash every evening. He told him to count his cash each night. I do not know how the conversation came up. All I know about it is there was something said, and I overheard Zwart tell Kelley to count it every evening instead of keeping a notebook memorandum. That was the first or second day that Kelley began to perform these duties."

The view in which the learned judge who presided at the trial denied the guaranty company's request for an instructed verdict, and submitted the case to the jury, is shown by his charge, in which it was said:

"Now, whether the money was there upon Saturday evening (August 23d) the evidence, of course, does not show. The evidence does not show when that $5,000 disappeared, and the evidence does not show who took the $5,000. The evidence does not show whether it was stolen or whether it disappeared through some act of carelessness in the shipment of money, or something of that kind; that is very largely a matter of conjecture, how it got out of there. But it disappeared, and the bank was and is short $5,000 from this reserve fund. * * * Now, while there is no proof that Mr. Kelley stole this money, and it is not claimed that he did, by counsel for plaintiff, you have a right to consider the facts that either somebody stole this money, or else it was gotten away with by the negligence of some one in sending it or shipping the money out to some other bank, or somehow or other, and the recipient of the money not making the mistake known. * * * Now, it has been argued that, because he did not count the money on each evening, it cannot be said that the loss resulted from that. In one sense that is true, but in another sense that is very material. If he had counted the money every evening, as instructed and directed by his superior officer, namely, the cashier, Mr. Zwart, the loss of the money would have been earlier ascertained. * * * But the money was counted in there when Mr. Kelley relieved Mr. Collins from the duties of that place. $5,000 of the money was gone when Mr. Collins came back to take his place. Therefore, you are warranted, not necessarily so, but you would be warranted in reaching the conclusion, that, while the method or cause of this loss is not shown, you would be warranted in finding that this money was lost by his negligence, by his blamable negligence, by his failure to exercise the degree of care that you would expect of me or anybody else intrusted with that amount of money. * * * The plaintiff bank has the burden of proof to show this negligence, or culpable negligence, as expressed in the policy, as charged in the petition; but, while that is true, and when the facts are all made known, you have a right to infer from all of these circumstances, that in some way or other, without disclosing the particular way, that this money was lost through his negligence; and the fact that other employés could go in and out of there, and that they could have taken it, of itself throws but very little light upon it. * * * This money was put there in Mr. Kelley's possession, debited to him on the books, showing he was in the care and control of it."

Thus the charge proceeded, upon the view that, while the matter of when and how the loss occurred and what became of the money was not shown but left to conjecture, Kelley's relation to the money, his control over it, and his custody of it, were such that the jury would be justified in inferring that the loss, because not shown to be otherwise, was in some way or other the result of culpable negligence on his part. Essentially the same idea is expressed by counsel for the bank, when they say:

"We contend that by the manner of procedure in this bank, and the system of accounting in vogue in this bank, we have shown conclusively that Kelley got the money and can't tell what became of it, and so his bond is liable unless they show what became of it."

We cannot concur in that view. It presupposes that the reserve cash was within the control and custody of Kelley, and applies to him the rule applicable to a bailee or other custodian whose situation is such that a loss, if not otherwise explained, warrants the inference that it was due to his negligence or dishonesty. Kelley occupied no such relation to this money. He could take from it to replenish the counter cash and add to it from the latter, and it was his duty to count it at the close of business each day, and then to lock the safe; but, in other respects, it was not within his control or custody. . It

was the cashier, and not Kelley, who carried the combination to the lock, who could say whether the reserve chest should be kept locked or unlocked during business hours, and who could otherwise take measures for the safety of the money. When Kelley was attending to his important duties in the paying teller's cage, as was required most of the time, the reserve chest and its contents were beyond the range of his observation, the chest was unlocked, and its contents were easily accessible to other employés, over whom he had no control, and who were passing in and out of the vault, and sometimes out of the bank, without any immediate supervision of their movements. True they had no right to disturb the money, but that was not an assurance that none of them would yield to the temptation which the situation presented; nor does the presumption of innocence, which would protect them from the charge of theft in the absence of satisfactory evidence thereof, warrant the inference that Kelley was either negligent or dishonest. Smith v. First National Bank, 99 Mass. 605, 97 Am. Dec. 59. Such an inference cannot be legitimately drawn from a rebuttable presumption, but only from premises which are certain. United States v. Ross, 92 U. S. 281, 23 L. Ed. 707; Manning v. Insurance Co., 100 U. S. 693, 25 L. Ed. 761; Looney v. Metropolitan R. R. Co. (U. S.) 26 Sup. Ct. 303, 50 L. Ed. ——; Globe Accident Ins. Co. v. Gerisch, 163 Ill. 625, 45 N. E. 563, 54 Am. St. Rep. 486; Chicago, etc., Ry. Co. v. Rhoades, 64 Kan. 553, 68 Pac. 58.

Passing, for the moment, the fact that Kelley neglected to make a daily count of the money in the reserve chest, it is plain that the evidence bearing upon the cause or occasion of the loss was altogether circumstantial, and was as consistent with the theory that the loss was occasioned solely by the personal dishonesty of one of the other employés, to whom the money in its exposed condition was easily accessible, as with the theory that it was occasioned by the personal dishonesty or culpable negligence of Kelley. Which theory was correct was left to mere conjecture. The bank had the burden of proof, and, as it failed to produce any evidence reasonably tending to establish the latter theory to the exclusion of the other, the guaranty company was entitled to a directed verdict in its favor. Asbach v. Chicago, etc., Ry. Co., 74 Iowa, 248, 37 N. W. 182; Smith v. First National Bank, 99 Mass. 605, 97 Am. Dec. 59; Crafts v. Boston, 109 Mass. 519; Morley v. Eastern Express Co., 116 Mass. 97; Searles v. Manhattan Ry. Co., 101 N. Y. 661, 5 N. E. 66; Ruppert v. Brooklyn Heights R. R. Co., 154 N. Y. 90, 47 N. E. 971; Chicago, etc., Ry. Co. v. Rhoades, 64 Kan. 553, 68 Pac. 58. As was well said by the Supreme Court of Iowa in Asbach v. Chicago, etc., Ry. Co.:

"A theory cannot be said to be established by circumstantial evidence, even in a civil action, unless the facts relied upon are of such a nature, and are so related to each other, that it is the only conclusion that can fairly or reasonably be drawn from them. It is not sufficient that they be consistent, merely, with that theory, for that may be true, and yet they may have no tendency to prove the theory."

The case of Smith v. First National Bank is well in point. It was an action to recover the value of bonds deposited with the bank for

safe-keeping and alleged to have been lost through its negligence. There was no evidence of negligence, except that which resulted by inference from the fact of loss, and the surrounding circumstances were such as to leave it equally open to inference that the bonds had been stolen by one of several persons who had access to the vault in which the bonds were kept. For a loss in the latter mode the bank was not responsible. The court, after observing that the plaintiff had the burden of proof, and that its evidence failed to exclude the possibility of loss by other means than negligence of the defendant, and left the case to be decided by mere inference, without any facts to determine which inference was correct, said:

"There being several inferences deducible from the facts, the plaintiff has not maintained the proposition upon which alone he would be entitled to recover. There is strictly no evidence to warrant a jury in finding that the loss was occasioned by negligence and not by theft. When the evidence tends equally to sustain either of two inconsistent propositions, neither of them can be said to have been established by legitimate proof. A verdict in favor of the party bound to maintain one of those propositions against the other is essentially wrong."

It remains to be considered whether, under the evidence, Kelley's failure to make a daily count of the money in the reserve chest could have been properly found to have been a proximate cause or occasion of the loss. Two propositions are submitted on behalf of the bank in that connection: One, that knowledge on the part of another employé, having access to the reserve chest, that a daily count of its contents was not being made, and therefore that a loss would not be promptly discovered, may have encouraged him to abstract the money when otherwise he would not have done so; and, the other, that, if a daily count had been made, the loss would have been disclosed at the close of business on the day in which it occurred, and this might have led to a discovery of the cause or occasion of the loss and to the recovery of the money. Neither proposition has any support in the evidence. Both are conjectural. There was no evidence of any general knowledge among the other employés that the reserve cash was not being regularly counted or °of the abstraction of the money by one who had knowledge of that fact. When the loss occurred, whether on the first, the last, or some intervening day of Kelley's service, was not known, and the evidence was devoid of any suggestion that an earlier discovery of the loss would have led to a recovery of the money. In truth, there was no attempt to show any causal connection between the failure to regularly count the reserve cash and the loss which the bank sustained, and certainly there was no such necessary or natural connection between them as would reasonably warrant any inference upon the subject.

Negligence is actionable only when loss or injury proximately results therefrom, and to be thus proximate the loss or injury must be a natural and probable consequence which ought to have been foreseen or reasonably anticipated in the light of the attendant circumstances. Milwaukee, etc., Railway Co. v. Kellogg, 94 U. S. 469, 475, 24 L. Ed. 256; Scheffer v. Railroad Co., 105 U. S. 249, 252, 26 L. Ed. 1070; St. Louis, etc., Ry. Co. v. Commercial Ins. Co., 139 U. S. 223,

237, 11 Sup. Ct. 554, 35 L. Ed. 154; Chicago, etc., Ry. Co. v. Elliott, 5 C. C. A. 347, 55 Fed. 949, 20 L. R. A. 582; Cole v. German Savings & Loan Society, 59 C. C. A. 593, 124 Fed. 113, 63 L. R. A. 416; Western Union Telegraph Co. v. Schriver (C. C. A.) 141 Fed. 538; Dubuque Wood & Coal Ass'n v. Dubuque, 30 Iowa, 176, 183; Handelun v. Burlington, etc., Ry. Co., 72 Iowa, 709, 32 N. W. 4.

Careful consideration of the evidence and of the arguments of counsel convinces us that there was no evidence legitimately tending to show that the loss was sustained through any personal dishonesty or culpable negligence on the part of Kelley, and that therefore the request of the guaranty company that a verdict be directed in its favor should have been sustained.

The judgment is accordingly reversed, with a direction to grant a new trial.

HOOK, Circuit Judge (specially concurring). In the charge of the Circuit Court, the guaranty company was held responsible for the failure of the acting paying teller to exercise a higher degree of care in the performance of his duties than that contemplated by the express language of the bond. For this reason I concur in the reversal.