## TUCKER STEVEDORING CO. v. W. H. GAHAGAN, Inc.

## THE CLAREMONT.

(District Court, D. Delaware. May 25, 1925.)

Nos. 1149, 1165.

1. **Canals** ⬷29—**Theories of defense, to account for injuries and sinking of barge in canal, held not sustained.**

Evidence held not to sustain theories of defense that injuries and sinking of barge in canal were caused by unseaworthy condition due to inherent defects or age, such condition due to injuries on trip to place of sinking, or contact with submerged wreck caused by swells and suction of passing boats.

2. **Evidence** ⬷588 — **Oral testimony, about facts of which opponent could not know, not to be arbitrarily rejected.**

While oral testimony with respect to crucial facts, about which opposing party could in the nature of things have had no knowledge, should be scrutinized with great care and caution, its inherent probability or improbability weighed, the extent to which it had been corroborated or contradicted by indirect or circumstantial evidence considered, and the general credibility of witness and the truthfulness or untruthfulness of his testimony on other material facts regarded, it should not be arbitrarily rejected.

3. **Evidence** ⬷587 — **Circumstantial evidence may outweigh direct evidence.**

Circumstantial evidence may outweigh opposing direct evidence.

4. **Evidence** ⬷587 — **Circumstantial evidence, consistent with opposing theories, proves neither.**

Conclusion may not be based on circumstantial evidence alone, unless the facts relied

on are of such nature and so related as to exclude every other fair and reasonable hypothesis; they, if consistent with either of two opposing theories, proving neither.

**5. Canals ⊜⊸29—Injury to barge in canal held caused by wave from falling of canal bank, undermined by dredge widening canal.**

Evidence *held* to show that injury to barge in canal was caused by striking on submerged wreck, brought about by a displacement wave, produced by sudden falling into the water of a large section of high bank, undermined by dredge engaged in widening canal.

In Admiralty. Two suits by the Tucker Stevedoring Company, one in personam against W. H. Gahagan, Inc., and the other in rem against the dredge Claremont, her tackle, etc. Decree for libelant.

Francis S. Laws (of Lewis, Adler & Laws), of Philadelphia, Pa., and William G. Mahaffy, of Wilmington, Del., for libelant.

Austin J. McMahon, of New York City, and Francis De H. Janvier and Edmund S. Hellings, both of Wilmington, Del., for respondent and claimant.

MORRIS, District Judge. About midnight of December 1, 1923, the barge Glee, owned by the libelant, Tucker Stevedoring Company, sank in the Chesapeake and Delaware Canal at a point in the deep cut west of Summit Bridge. Injuries to the barge had caused it to fill with water and overturn. To recover its damages, the libelant instituted these two suits in admiralty. One is in personam against W. H. Gahagan, Inc., which was engaged in widening the canal, by the removal, with a hydraulic dredge, of the north bank near the point at which the Glee sank. The other is in rem against the dredge Claremont, employed in that operation. In the latter suit Gahagan Dredging Company, Inc., is claimant. The suits have been tried together.

The Glee was a wooden barge having a length of 65 feet, a beam of 23 feet 9 inches, and a depth of 6 feet. The sinking resulted from injuries, on the port side near the stern, to the bottom planking, bilge keelson, and lower wearing strake. The bottom planks, tenth, eleventh, twelfth, thirteenth, and fourteenth from the stern, were started from their fastenings, and two, the tenth and eleventh, were broken. The planks were 3 inches thick and 10 inches wide. The oak bilge log, 12 inches thick and 12 inches wide, and the lower wearing strake, 3 inches thick and 10 inches wide, were also broken. What caused these injuries is the crucial question in these suits.

The libelant asserts that they were caused by the negligence of the claimant respondent. Its method of operation was to cut away with a bore, with which the dredge was equipped, the bank beneath the water line. The bank above, deprived of support, slid or fell into the water. The earth so mixed with or held in suspension in the water was then projected through a pontoon line to a place of deposit. More narrowly stated, libelant's position is that a huge mass of earth, constituting a portion of the bank, being so undermined, fell suddenly into the water of the canal, creating a large displacement wave, whereby the Glee was raised, then dropped heavily upon the submerged wreck of the barge Bailey, and injured.

Libelant contends that there was negligence and danger in the removal of a bank of the height of this one, 47 feet above the water line, by the hydraulic method. It further contends that the earth of the bank being removed was of such character that it would not slide gradually into the water, and thus maintain a gentle slope, but remained firm and the slope precipitous until the undermining had proceeded to such an extent that the weight of the overhanging mass brought about its sudden fall, and that, with knowledge of these facts and of many previous massive falls or slides, the claimant respondent failed to notify the Glee of the imminent danger.

The claimant respondent denies that it was negligent in removing the 47-foot bank of the canal by the hydraulic method, denies that its operations were otherwise conducted in a negligent manner, and denies that either a fall of earth or a displacement wave occurred at or about the time of the sinking of the Glee. It asserts that the Glee sank because (a) it was in an unseaworthy condition, due to inherent defects or to age; (b) it was in an unseaworthy condition, due to injuries to its bottom, sustained on its trip from Philadelphia through the canal to the place of sinking; (c) if the injuries were caused by contact with the Bailey, such contact was brought about by the swells and suction of passing boats; or (d) because of a combination of any two or more of these causes.

The Glee, which was equipped as a hoister or whirler, having a skeleton steel mast 55 feet high, with a steel boom at the top 15 or 20 feet in length, left Philadelphia about noon of November 30th to salvage the pig iron cargo of the Bailey, which had sunk in the canal a short time before. It was with-

out rudder or means of self-propulsion. Its position while proceeding down the river was at the stern of a tow, consisting of two double box barges, abreast, in addition to the Glee. Before entering the locks at Delaware City, one of these boxes was damaged by collision with the tug. In the canal the tow consisted of the remaining boxes and the Glee, arranged one after another; the Glee's position being still at the stern. The Glee arrived at the Bailey at 7 or 7:30 in the morning of December 1st. The Bailey then lay a few feet south of the dredge (which was advancing from west to east), parallel with it, and about opposite its stern.

As the Bailey, which had a length of 160 feet, a beam of 23 feet 9 inches, and a depth of 12 feet, lay almost parallel with the old channel, and as its bow, pointing eastward, rested upon the north edge of the bed of the old channel, 9 feet 6 inches deep, and projected above the water, while its stern, probably resting upon the bottom of the newly dredged portion of the widened canal, 30 feet in depth, was completely submerged, the Glee took its position, not athwart the Bailey and in the narrow 35-foot channel of the canal, but in line with and above the submerged portion of the Bailey. It was there held in place by two stern lines, made fast to bitts on the Bailey's projecting bow, and by an anchor, dropped to the westward, attached to a 75-fathom line running from the bow of the Glee. Throughout the day of December 1st the Glee was active in attempting to remove the cargo of the Bailey. About dark the stern lines were eased off and the Glee drawn to the westward, until, according to testimony of one of its crew, there were 7 feet of water between the bottom of the Glee, at the stern, and the uppermost part of the underlying portion of the Bailey. The lines were then made taut. She sank shortly after midnight.

[1, 2] Considering, first, the affirmative theories advanced by the claimant respondent to account for the injuries, the bare mention of the first of these theories must suffice, for I find no evidence that even remotely tends to establish that the Glee was in an unseaworthy condition, due to inherent defects or to age. As to the next, I am convinced by the character and extent of the injuries, by the length of the period which elapsed between the termination of the trip of the Glee through the canal and its sinking, by the presence in the hold of the Glee many times during the day of persons who were aboard of her, and by the act of the crew in retiring without leaving some one on watch, that the injuries were not sustained while the Glee was passing through the canal.

Of its several theories, suggested as equally or more reasonable hypotheses than that of the libelant to account for the injuries to the Glee, the claimant respondent probably relies mainly upon its third or next contention—that the passage of the steamers Ericsson and Anthony Groves through the canal produced such disturbance of the water as to permit the Glee to strike upon the Bailey. The Bailey lay about 200 or 250 feet westerly from the easterly end of the widened channel, or, otherwise stated, from the face of the bank upon which the dredge was working. Its position was such that it partly obstructed the old channel, 35 feet in width. The testimony of the officers of the Ericsson and of the Anthony Groves was that in passing this point every precaution was necessary; that their engines were shut down some distance away, and that their headway was reduced to a speed not more than adequate for control.

The narrowness of the channel at this point is strongly confirmatory of that testimony. There is no direct and express evidence that the passage of the steamers in such manner would produce, by waves or suction, a displacement of the water sufficient to bring the Glee in contact with the Bailey. Nor do I think that the mere passage of the vessels in the manner stated will warrant an inference to that effect. The claimant respondent does not contend that the disturbance of the water by the passage of either of the two vessels could have caused the Glee to drop 7 feet. Its position is that the testimony of the crew of the Glee, to the effect that upon the conclusion of the day's work, the Glee was moved westward, and by actual measurement, after the movement, 7 feet of water was found beneath the Glee at its stern, is not to be relied upon or believed, and that probably only 2 or 3 feet intervened between the bottom of the Glee and the top of the Bailey, lying immediately beneath it, and that the agitation of the water produced by the passing steamer could have caused and did cause the Glee to drop that distance.

While it is true that oral testimony with respect to crucial facts, about which the opposing party could in the nature of things have had no knowledge, should always be scrutinized with great care and cau-

tion, its inherent probability or improbability weighed, the extent to which it has been corroborated or contradicted by indirect or circumstantial evidence considered, and the general credibility of the witness and the truthfulness or untruthfulness of his testimony pertaining to other material facts regarded, yet it should not be arbitrarily rejected. After viewing in the light of these principles the testimony that the Glee was moved at nightfall to a position in which there were 7 feet of water between her bottom at the stern and the topmost part of the Bailey lying beneath her, I can find no sound basis for disbelieving or disregarding it. It follows that the theory and contention of the claimant respondent that the approximate cause of the injuries to the Glee was the swell and suction of the steamer Ericsson, or the Anthony Groves cannot be sustained.

The first three affirmative theories advanced by the claimant respondent to account for the injuries and sinking of the Glee not being sustained by the evidence, support for the theory that the injuries were the result of two or more of the first three supposed causes is also wanting.

[3-5] Are the facts more consistent with the opposing theory of the libelant that the injuries were the result of a displacement wave produced by the sudden fall into the canal of a large section of the bank? Like all other theories advanced to account for the injuries, that of the libelant rests partly upon probabilities and circumstantial evidence. There is no direct evidence that there was in fact such a fall of earth shortly before the Glee sank. On the contrary, there is direct evidence that there was no fall of earth at that time. But neither a court nor a jury is bound to adopt the statements of witnesses, solely because no other witness has directly denied them and the character of such witnesses has not been impeached. There may be contradiction by circumstances, as well as by contrary statements of others. Again, such witnesses may be interested, or there may be such a degree of improbability in the statements, though positively made, of such witnesses, as to deprive them of credit. Hence the principle is now well established that circumstantial evidence may outweigh opposing direct evidence. The Struggle, 9 Cranch, 71, 3 L. Ed. 660; Quock Ting v. United States, 140 U. S. 417, 11 S. Ct. 733, 851, 35 L. Ed. 501. Yet sound reason, as well as settled law, demands that a conclusion shall not be based upon circumstantial evidence alone, unless the facts relied upon are of such a nature and are so related to each other as to exclude every other fair and reasonable hypothesis. If the facts are consistent with either of two opposing theories, they prove neither. United States F. & G. Co. v. Des Moines Nat. Bank, 145 F. 273, 74 C. C. A. 553 (C. C. A. 8).

The precise question, then, is whether the facts support the libelant's theory, and, if so, whether they support that theory alone, or another theory as well. Some facts, established I think beyond dispute, are that approximately 7 feet of water lay between the bottom of the Glee and the topmost part of the underlying portion of the Bailey; that the injuries to the Glee were of such character as to cause the Glee to fill rapidly, and to sink within a short time after being so injured; that a short time before the Glee sank the waters of the canal were violently agitated by waves running from the direction of the face of the bank being removed by the dredge; that the soil of the bank being removed was not crumbly or sandy, but so firm and strong that undermining to a considerable extent was necessary before the bank would fall; that the slope of the bank for like reason was precipitous, not gentle; that the volume of earth that would fall into the water suddenly from time to time was sometimes large; that the claimant respondent had notice of the probability thereof from the contract under which it was operating; that sudden slides or falls of large masses of earth, with corresponding consequential displacement waves, had occurred from time to time during the operation before December 1st, and that one occurred within an hour or so after the Glee sank.

From these facts I think it reasonable to suppose, and in truth highly probable, that the injuries to the Glee and its subsequent sinking were the result of forcible contact with the Bailey, brought about by a displacement wave of a size not reasonably to have been anticipated by the crew of the Glee; that such wave was produced by the sudden falling of a large undermined section of the bank into the waters of the canal, and that the injuries to the Glee were due to the negligence of the claimant respondent. Moreover, I think the evidence supports this conclusion and none other. The amount of libelant's damages is to be subsequently ascertained.

A decree must be entered for the libelant.