GEORGE FENEIS, as Administrator, etc., of MARY FENEIS, Deceased, Respondent, *v.* ISAAC P. LEWIN, Appellant.

Second Department, November 22, 1918.

**Landlord and tenant — liability of landlord under Tenement House Law for failure to provide fire escapes, etc.— tenement house, what constitutes — new trial — submission and decision upon erroneous theory — failure to take exception — evidence — intent.**

In an action to recover for the death of the plaintiff's wife, resulting from injuries received in attempting to escape from a burning building through one of the windows, upon the ground that the defendant negligently,

. carelessly and wrongfully allowed the building alleged to be a tenement house, to be used without proper safeguards, consisting of fire escapes, etc., it appeared that each of the two upper stories was intended to be used as an apartment, but that the first floor consisted of a store with one room in the rear. During the eleven years between the construction of the building and the fire, the rear room on the store floor had been used for residence purposes for but one year and two months, and the defendant claimed that this was without his knowledge, and that he dispossessed the tenant when his attention was called to the illegal occupation. The question at issue was whether or not the building constituted a tenement house within the meaning of the Tenement House Law.

*Held*, that it was error to instruct the jury that if the defendant's building *could be* let out for three families they might find that it was a tenement house, as there is no such provision in the statute.

The court should have submitted to the jury the question whether the house was " intended, arranged or designed " to be occupied by three or more families.

The fact that there were but two families in the house at the time of the fire, and for fourteen months previous, was material upon the question at issue.

A tenant renting a store on the first floor of a three-story building cannot change the character of said building to that of a tenement house by surreptitiously using part of the store as a living apartment, without the knowledge of the landlord.

The court may grant a new trial where a case has been submitted to and decided by a jury upon a wholly erroneous theory, although no exception was taken.

It was reversible error for the trial judge to refuse to permit the defendant to testify to the cause of the removal of the tenant from the first floor fourteen months before the fire.

Notwithstanding the fact that the plans show a building intended for two families, not three, and, therefore, not subject to the requirements of the Tenement House Law, if the owner knowingly permits the building to be used by three families in violation of the law, or intends it to be so used, he is bound by the requirements of the statute enacted for the protection of the tenants.

APPEAL by the defendant, Isaac P. Lewin, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Kings on the 15th day of April, 1918, upon the verdict of a jury for $10,000, and also from an order entered in said clerk's office on the 17th day of April, 1918, denying defendant's motion for a new trial made upon the minutes.

*Luke D. Stapleton* [*R. Waldo MacKewan* with him on the brief], for the appellant.

*William G. Cooke* [*Howard O. Wood* with him on the brief], for the respondent.

KELLY, J.:

On June 25, 1916, George Feneis lived with his wife and three children aged eight, six and a half, and five years respectively, upon the third or top floor of defendant's building on New Utrecht avenue in the borough of Brooklyn. They had resided there from May 1, 1916. Shortly after five o'clock in the morning of June twenty-fifth a fire occurred in the house, and in attempting to escape through one of the front windows Mrs. Feneis fell to the street, receiving injuries which resulted in her death, and Feneis was himself injured. This action was brought by the administrator to recover damages for the death of his wife, and it is alleged in the complaint that the house was a tenement house three stories in height, built to be occupied as a home or residence by three or more families living independently of each other and doing their cooking upon the premises. The plaintiff alleges that it was the duty of the defendant, in accordance with the statute in such case made and provided, to have a direct way of egress accessible to each story either by outside fire escapes or by fire towers or such flights of stairs as are provided for in the Tenement House Law, and charges that defendant neglected to provide such safeguards and negligently, carelessly and wrongfully allowed the building to be without them prior to and at the time of the fire, and that the deceased was free from negligence. The defendant answered admitting his ownership of the premises and the tenancy of Feneis, denying the other allegations of the complaint. Upon the trial defendant admitted the happening of the fire and the death of plaintiff's wife in attempting to escape, and the only question at issue was whether the defendant's building was a tenement house under the law, the learned trial judge instructing the jury that if the building was not a tenement house there was no obligation on the defendant to maintain fire escapes. The judge also charged the jury that they were to determine whether

the building was a tenement house, and if they so found, and further that the absence of fire escapes caused the accident, they were justified in finding the defendant guilty of negligence.

The difficulty presented by the appeal is that, I think, the learned judge erred in his definition of a tenement house under the law, and that he did not properly instruct them as to the question of fact presented by the evidence concerning the character of this particular house. The liability of the defendant for the death of plaintiff's wife and the resultant recovery of damages depends entirely upon whether the defendant's building was a tenement house, and the importance of a clear submission of the questions of fact involved is apparent.

First as to the learned judge's definition of a tenement house. The definition is found in the Tenement House Law (Consol. Laws, chap. 61 [Laws of 1909, chap. 99], § 2, subd. 1, as amd. by Laws of 1912, chap. 13). The better course for the trial judge, in a case of this description, would have been to read the statutory definition to the jury and he might then go on to explain it or illuminate it in any proper way. Instead of doing this, he attempted to paraphrase it as follows: " A tenement house, for the purpose of this case, is any house or building or portion thereof constructed and let out to three or more families as a residence, living independently of each other and doing their cooking and other necessary housekeeping work," and he immediately proceeded to discuss what in his opinion was necessary for housekeeping. He said there must be certain improvements; that there must be a " toilet accessible or for the use of each of the three families in the house;" that while a bathroom was not indispensable, there must be a " toilet." " There must be room for cooking. There must be a place for the cooking, even though the tenant has to supply the stove upon which the cooking is done. There must be, as I say, water running into the apartment. Now, considering all those things, was this house so fitted that it could be or was, or was intended to be let out for three families living separately and independently and apart from each other? That is the question for you gentlemen to determine." It will be perceived that the trial judge, having discussed certain

essentials and non-essentials for housekeeping not found in the statute, told the jury that if the defendant's building *could be* let out for three families they might find that it was a tenement house. I think this is much broader than the statutory definition. There are few private houses which could not be let out for occupancy by three families. The statute, however, contains no such provision. The Legislature has defined a tenement house in the Tenement House Law (§ 2, subd. 1, as amd. *supra*): " A ' tenement house ' is any house or building, or portion thereof, which is either rented, leased, let or hired out, to be occupied, or is occupied, in whole or in part, as the home or residence of three families or more living independently of each other, and doing their cooking upon the premises, and includes apartment houses, flat· houses and all other houses so occupied." And it is provided in section 2, subdivision 11: " Wherever the words ' is occupied ' are used in this chapter, applying to any building, such words shall be construed as if followed by the words ' or is intended, arranged or designed to be occupied.' " So I think the learned trial judge erred in instructing the jury that the criterion was whether the house " *could be* " let out for three families. There is no such provision in the law. Nor was the judge's reference to the requirement as to " toilets " in tenement houses exact. The act prescribes (§ 93) that in every tenement house there shall be a separate water closet in a separate compartment within each apartment. There are many other requirements concerning tenement houses which are not found in defendant's building, and if the requirements were to be referred to at all, it would seem as if the better course would have been' to tell the jury what they were. The judge referred to the presence or absence of bathtubs, stoves, room for cooking and water running into the apartment. There is nothing in the law requiring bathtubs or stoves in tenements; the size of rooms is prescribed; the statutory requirement (§ 92) is that there shall be in " each apartment " a proper sink with running water.

The importance of correct definition and instruction as to what constitutes a tenement house under the law is emphasized by the peculiar facts presented by the record in the case at bar. Referring again to the statutory pro-

vision cited, the first prominent fact is that at the time of the fire, and for fourteen months prior thereto, the defendant's building was occupied by but *two* families. Neither the house or building, nor any portion thereof, was rented, leased, let or hired out, to be occupied, nor was it occupied in whole or in part, as the home or residence of three families or more. If the statute stopped there, clearly defendant's building would not come within the definition. But the Legislature goes further, and says in subdivision 11 of section 2 that when the words " is occupied " are used in the statute they shall be construed as if followed by the words " or is intended, arranged or designed to be occupied." This was really the issue, and I cannot find that it was submitted to the jury at all. The judge left it to them to say whether the house was " so fitted that it *could be* or was, or was intended to be let out for three families living separately and independently and apart from each other." The vital question is, was this house " intended, arranged or designed " to be occupied by three or more families. That was the issue which should have been submitted to the jury. There was a clear cut question of fact raised on this issue by defendant's answer and the evidence on the trial. Photographs and plans of the house are attached to the record as exhibits. They show the plan of the second and third floors clearly laid out for an apartment on each floor consisting of parlor, two bedrooms, dining room, kitchen, a hall bedroom, a bathroom and water closet, an apartment for one family on each floor. But the plan of the first floor, approved by the superintendent of buildings of the borough of Brooklyn in 1905, shows an entirely different layout. There is a store in the front of the first floor, with a sink and water closet at the back of the store and a dumb waiter and a ventilating shaft running from the cellar to the roof. There is a room back of the store which, according to the plans, is devoid of all fittings, because the sink, etc., are all at the back of the *store* and separated by a wall from the room or space in the rear. An inspector from the building department testified that he examined the building after the fire, and found a three-story and cellar brick building with a store on the ground floor and arranged for one family on each of the second and third stories; that there was a room at the rear of

the store and that this room " contained a sink and water-
closet." And the architect testified that the sink was in the
room, and another witness called by defendant said the back
room was just a square room, " just a sink and toilet  *  *  *.
That is all." The defendant, the owner of the premises,
testified that the room back of the store was used for store
purposes only to keep the stock. He said that when he
rented the first floor to a tenant named Weisler (whom he
dispossessed fourteen months before the fire upon receiving a
complaint from the tenement house department that the tenant
and his family were living in the back room, and who did
then move out) there was " just that sink in the rear of
the store, and the toilet at the front." All of this is con-
fusing and contradicts the plan drawn by the architect and
said to be correct, because the plan shows that the rear room
has nothing in it. No sink, no water closet; these things
are at the back of the *store proper*. In the rear room there is
no clothes closet, no closet for kitchen utensils, no washtubs,
no gas connections, no facilities for housekeeping. There is a
flue in the wall for heating purposes, but heat is necessary in a
store. And plaintiff says that the rear windows on the first
floor were protected by iron bars. It does not seem that this
first floor was, to use the words of the statute, " intended,
arranged or designed " to be occupied for living purposes as a
home or residence.

But plaintiff offered evidence to show that this store floor
had in fact been used as a residence. The Weisler family
conducted a laundry in the store, and Mrs. Weisler testified
that from February 22, 1914, to April 17, 1915 (fourteen
months before the fire), she kept house in the rear room for
her husband, herself and her child, and that despite the
absence of ordinary household attachments she had a baby
born in the room in question during the tenancy. While
the birth of the baby is an important circumstance, still,
considered alone, it would not constitute the room a residence
or home, because we know that babies may be born anywhere,
stables, street cars and department stores, but she says the
family slept and ate there. And a neighbor who lived in a
house adjoining for ten or twelve years says the rear room was
used " as a kitchen " when she first went there, by an Italian,

and that the Italian was there for a year occupying the store as a fruit and vegetable store and he used the back room as a kitchen — " they cooked there and ate, and for a time his son used to sleep in the back room; they had a bed couch there." It will be noted that the witness does not say the Italian storekeeper *lived* in the rear room. This was ten years before the fire. The Italian was there for a year, and he and his wife might cook their meals in the rear room and eat them while attending to the store, and his son might have slept on a couch for a time without any suggestion that the place was a home or residence. But this neighbor also observed the Weislers during their occupancy and she corroborates Mrs. Weisler as to the use of the room for living purposes. The defendant on the witness stand denied that he knew that the Weislers were using the back room for living purposes until he was notified by the tenement house department, when he compelled them to move out. He says he never was in the back room during Weisler's tenancy, although Mrs. Weisler denies this and says he was, and that he knew they were using it for housekeeping. It will be seen, therefore, that in this house built in 1905, eleven years before the fire, the only occasion when there is any evidence of use of the back room for living purposes is during one year and two months from February 22, 1914, to April 17, 1915, when the Weislers lived there. I do not think the evidence of the Italian occupancy justifies a finding of residence use. During the eleven years there was one year and two months' use of the room as a home — the defendant says without his knowledge and that he caused the tenant to leave when he ascertained the illegal use — because such occupancy would have been illegal as there is no pretense that the building was fitted up to comply with the Tenement House Law in any particular.

But the question of the intention of the defendant was not submitted to the jury, and no exception was taken and no request made to instruct the jury on this fundamental question, and the omission was accentuated by the trial judge in his charge, when he said: " It does not matter that, at the time of this fire, there were only two families in the house. That is not the test of a tenement house, because there might be an apartment house for fifty families and all of them might

move out but one. Your common sense tells you that that would not be the test as to whether or not this was a tenement house."

Again there was no exception to this instruction, although on the proof here, for the purpose of determining whether this particular house, laid out as shown by the plans, was " intended, arranged or designed to be occupied " as a home for three families, the fact that there were but two families in the house at the time of the fire and for fourteen months previous would seem to be material. This was not the case of a tenement or apartment constructed or used for " fifty families; " to such a building the remarks of the learned judge would apply.

I do not believe the law to be that a tenant renting a store can change the character of the building to that of a tenement house by surreptitiously using part of a store as a living apartment without the knowledge of the landlord. If the landlord on ascertaining the fact puts him out, I think he has shown that he is not a party to the illegal use. And another consideration: Even admitting that the rear room had been used for living purposes contrary to the law, with the landlord's knowledge, it seems to me that when the landlord put the tenant out fourteen months before the fire, the premises remaining vacant all that time, the jury might well infer that notwithstanding his past transgressions he had reformed. I think these things should have been submitted to the jury in this case. Whether, if the issue was properly submitted to a jury, the verdict would have been different, I do not know, but I am impressed with the feeling that defendant has been adjudged guilty of negligence resulting in the death of a human being, and besides mulcted in damages in the sum of $10,000, on a submission of the case which did not present to the jury the real question upon which his liability must be based. It is a serious matter for the plaintiff and for the defendant.

Under the facts as presented in this case, the issue was whether the defendant's building was " intended, arranged or designed to be occupied, in whole or in part, as the home or residence of three families " (Tenement House Law, § 2,

subds. 2, 11); concededly it was not occupied by three families at the date of the fire, and the store floor, upon the use of which the case depends, had been vacant for fourteen months before the fire. During the eleven years between the construction of the house in 1905 and the fire in 1916, the rear room on the store floor had been used for residence purposes for but one year and two months, and defendant claims that this was without his knowledge and that he dispossessed the tenant when his attention was called to the illegal occupation. The issue as to the intention of the defendant as to the use of the store and back room was not submitted to the jury. While there is a dearth of exceptions or requests to charge upon this branch of the case, there is no question as to the power and duty of this court to grant a new trial where a case has been submitted to and decided by a jury upon a wholly erroneous theory although no exception was taken. (Code Civ. Proc. § 1317; *Standard Oil Co.* v. *Amazon Ins. Co.,* 79 N. Y. 506; *Roberts* v. *Tobias,* 120 id. 1; *Whittaker* v. *D. & H. C. Co.,* 49 Hun, 400; *Leach* v. *Williams,* 12 App. Div. 173.) The real estate agent who had charge of the renting of the store floor after Weisler's removal fourteen months before the fire, was asked what instructions were given him by defendant in reference to the renting of the property, but plaintiff's objection to the question was sustained although no exception to the ruling appears in the record. I think, however, that defendant should have been permitted to inform the jury as to why the tenant Weisler was forced to vacate the ground floor in April, 1915, fourteen months before the fire, and that the exception taken to the refusal of the learned trial judge to permit defendant to testify to the cause of Weisler's removal presents reversible error. It is conceded that the premises were not occupied by three families at the date of the fire in June, 1916, and that they had not been so occupied for fourteen months prior thereto. The plans show a building intended for two families, not three, and, therefore, not subject to the requirements of the Tenement House Law (Consol. Laws, chap. 61, § 2, as amd. *supra*). Notwithstanding this, if the defendant knowingly permitted them to be used by three families in violation of the law, or intended them to be so used, he was bound by

the requirements of the statute enacted for the protection of the tenants. His intention and the design and arrangement of the premises thus became the crucial question in the case, and the evidence excluded was material and relevant on this issue.

The judgment and order are reversed and a new trial granted, costs to abide the event.

MILLS, PUTNAM and JAYCOX, JJ., concurred; BLACKMAR, J., concurred in the result, holding that the intent mentioned in the statute does not mean the intent in the mind of the owner, but rather the intent to be inferred from the construction and arrangement of the premises.

Judgment and order reversed and new trial granted, costs to abide the event.