ESTHER FRIEDMAN, as Administratrix, etc., of MARY FRIEDMAN, Also Known as MAY FRIEDMAN, Deceased, Respondent, Appellant, *v.* SHINDLER'S PRAIRIE HOUSE, INC., and Another, Appellants, Respondents.

Third Department, June 22, 1928.

*John D. Lyons* [*Nellie Childs Smith* of counsel], for the plaintiff.

*Nadal, Jones & Mowton* [*Bernard G. Barton* of counsel], for the defendant Schindler's Prairie House, Inc.

*Boshe, Schiller, Marvin & Serling* [*Ellsworth Baker* of counsel], for the defendant Samuel Shindler.

DAVIS, J.  Shindler's Prairie House, Inc., located about one and one-half miles from Hurleyville, Sullivan county, burned to the ground on the night of February 22, 1926.  About forty guests were being entertained.  Several of them lost their lives.

Mary Friedman had come from New York to stay over the week end as a guest paying compensation.  With two other young women she occupied a sleeping room on the third floor.  They were awakened by the fire and opened the door of their room.  The hall was filled with flames and it was impossible to leave in that

direction. They then turned to the window which was the only remaining avenue of escape. They searched for a rope or other means of descent, but found none. People on the ground called to them to wait and aid would be at hand. Soon the flames burst through behind them, and one after another they jumped, Mary being the last. She died the next day, concededly as a result of the burns thus received. This is a statutory action to recover damages. (Decedent Estate Law, art. 5, as added by Laws of 1920, chap. 919.)

On the trial the questions of liability at common law and under the statute were submitted to the jury. At common law the duty of the owner or proprietor of a public house toward his guests is to exercise reasonable care for their safety. (17 Halsbury Laws of England, 313; 21 id. 431; *Sandys* v. *Florence*, 47 L. J. C. P. Div. [N. S.] 598; *Clancy* v. *Barker*, 71 Neb. 83.) But a hotelkeeper was not liable as an insurer of their personal safety; and if the building was properly constructed, there was no duty to maintain fire escapes, the ordinary means of escape by doors and windows being deemed sufficient. (*Weeks* v. *McNulty*, 101 Tenn. 495; *Yall* v. *Snow*, 201 Mo. 511; *Strahl* v. *Miller*, 97 Neb. 820; affd., *sub nom. Miller* v. *Strahl*, 239 U. S. 426.) It has been held that by reason of the contractual relationship existing there is an implied warranty that the premises are, for the purpose of personal use by the guest, as safe as reasonable care and skill on the part of any one can make them. (*MacLenan* v. *Segar*, L. R. [1917] 2 K. B. 325.)

The building was so constructed that if a fire once started it would soon cut off all possibility of escape through the ordinary exits. This made it all the more incumbent on the defendants to be vigilant in preventing fires, in taking reasonable precautions to subdue any fire at its inception, and seasonably to warn guests of their danger. There is evidence that the manager understood and appreciated the risks inherent in the form of the structure of this building with its highly inflammable material. He had provided a pressure water tank in the cellar to which were attached fire hose located in the halls; and he had a watchman who remained throughout the night. Apparently when the guests retired the office was closed and the watchman was the only person on duty.

On the evening of this holiday the guests had assembled in the lounging room where a brisk fire was kept burning in the fireplace located under the landing of the stairs. The fire was replenished from time to time by the guests and watchman. The chairs and settees about the fire were of wood upholstered with cloth. Sparks were thrown out at times so that the guests were obliged to move back their chairs. There is some dispute as to whether the fire

was still burning when the guests retired. The last one to leave testifies there were logs burning when he retired at twelve-twenty A. M. He says some of the settees were then near the fireplace; that there was no screen before it, no one was in the office, and the watchman had not been about for some time. The negligent origin of the fire was a question of fact which the jury was authorized to determine by reasonable inferences drawn from the facts and circumstances proved. (*Warner* v. *N. Y., O. & W. R. Co.*, 209 App. Div. 211; appeal dismissed, 239 N. Y. 507.) There was evidence that the watchman appeared to be somewhat intoxicated during the evening. At any rate, the fire remained undiscovered until the entire building was in flames, the fire hose was not used, and no warning was given to the guests. The watchman's body was found in the ruins, so it is a fair inference that he was asleep or at least inattentive to his duties when the fire broke out. His neglect is chargeable to the defendants, for the primary duty of care devolving on them was not delegable. (*Stott* v. *Churchill*, 15 Misc. 80; affd., 157 N. Y. 692; *Sciolaro* v. *Asch*, 198 id. 77.) So if the question was one of liability at common law, we could readily say the verdict for plaintiff was justified. The instructions as to the structural defect have the support of authority. (*MacLenan* v. *Segar, supra.*)

We think, however, the question was determined on the theory that the defendants were liable for a breach of statutory duty. Section 205 of the General Business Law provides, so far as is material here, that " Every owner, lessee, proprietor or manager of a hotel, not fireproof, exceeding two stories in height, shall cause to be placed a rope or other better appliance, to be used as a fire-escape, in each room of such hotel, used as a lodging-room, above the ground floor, which rope or other appliance shall be securely fastened into one of the joists or timbers next adjoining a frame of a window of such room." The statute does not define a hotel.

One principal subject of controversy was whether the building was operated as a hotel. It was shown with no practical dispute that the building was in the main three stories in height with a tower containing sleeping rooms still higher. There was an office, a large dining room, a kitchen thoroughly equipped, a sun parlor, billiard room, dance hall, writing room and a large lounging room. In all there were about seventy rooms, of which fifty-seven were sleeping rooms. There were entertained at times one hundred and fifty guests. The management operated a bus which met trains, and the driver called out the name of the house. Those who came with no previous arrangement were taken to the house without charge, except for conveying their baggage. A clerk was in the office; they registered and were assigned to rooms. Ordinarily

they did not inquire concerning rates. No inquiry or statement was usually made concerning the length of their stay. They were furnished lodging, meals and had opportunity for recreation, including music, dancing and certain sports. A bookkeeper was employed; a safe was maintained in the office where valuables might be deposited, and a notice to that effect was posted in the rooms. There is evidence that transient guests in limited numbers came, had meals or stayed over night, for which accommodation they paid. There were all the elements that go to make up the conduct and operation of a hotel as the term is ordinarily understood.

The defendants maintained that this institution was but a boarding house, and produced evidence from which it is claimed that the location of the house and the manner in which it was conducted did not bring it within the definition of hotel. Usually the question as to the character of the relation between a person who entertains others for compensation, or of the house at which they are entertained, is one of fact. (14 R. C. L. 493.) It is not greatly important just what the building used for entertainment of guests is called — the facts including the apparent purpose of the proprietor or owner are determinative. (*Willard* v. *Reinhardt*, 2 E. D. Smith, 148; *Krohn* v. *Sweeney*, 2 Daly, 200; *Feneis* v. *Lewin*, 185 App. Div. 41, 46; *Hancock* v. *Rand*, 17 Hun, 279; affd., 94 N. Y. 1; *Nelson* v. *Johnson*, 104 Minn. 440; *Fay* v. *Pacific Imp. Co.*, 93 Cal. 253; 16 L. R. A. 188.)

Here it appears that the defendant corporation was organized for the purpose, among others, to conduct hotels. In the applications for insurance Schindler's Prairie House was sometimes described as a hotel and sometimes as a boarding house. In some advertisements published in New York papers it was called a hotel. There were rates not by the week or month, but by the day, for those whose visits were brief.

Formerly public houses were called "inns" or "taverns." In this country the term is now almost exclusively "hotel." Ancient definitions cannot now be accepted without reservation. In earlier times it was the entertainment of the traveler or transient guest who had errands of business that was important in determining the character of the house. The function and purpose of hotels change with the period, methods of travel and conditions of society. (*Dixon* v. *Robbins*, 246 N. Y. 169, 173.) Now hotels are often devoted to the entertainment of guests seeking rest, recreation and pleasure. They are located in the mountains and at the seaside where guests may go in the summer; or they may be located where there is a warm climate to attract guests who wish to escape the rigors of winter. They differ in the main from purely commercial

hotels only in respect to the greater attention they give to features of recreation and amusement, and in the usual duration of stay of the guests. The learned trial court required the jury to make a special finding on the question, and their finding that the building was a hotel is amply supported by the evidence.

Assuming, then, that the building was a hotel, the decedent was one of the class for whose benefit the legislation for the protection of human life was intended; and a right of action was given for breach of the statutory duty. (*Willy* v. *Mulledy*, 78 N. Y. 310; *Amberg* v. *Kinley*, 214 id. 531; *Ward* v. *Erie R. R. Co.*, 230 id. 230; *Karpeles* v. *Heine*, 227 id. 74; *Hoopes* v. *Creighton*, 100 Neb. 510; *Adams* v. *Cumberland Inn Co.*, 117 Tenn. 470.) Under the statute the duty of the defendants was absolute. When a person engages in business regulated by statute, he accepts the duty of fulfilling the obligation. (*Miller* v. *Strahl*, 239 U. S. 426.) In this respect the charge of the court was favorable to the defendants, for they were held only to the rule of reasonable care.

Of course, it was necessary to establish that violation of the statute was the proximate cause. (*Pauley* v. *S. G. & L. Co.*, 131 N. Y. 90; *Acton* v. *Reed*, 104 App. Div. 507; *Weeks* v. *McNulty*, *supra*.) On this question there can be little doubt found in the facts. The window offered the only means of escape. A rope would have afforded early opportunity to descend without great risk.

The defendants argue that by earlier visits at the hotel the decedent had become familiar with the absence of means of escape, and had waived compliance with the statute, and assumed the risk. It is doubtful if public policy would permit non-compliance with the law by waiver or express contract. (*Adams* v. *Cumberland*, *supra*.) But it is unnecessary to decide that question here. Assuming that waiver and assumption of risk are questions of fact in this case, the burden was on the defendants to establish them, and the jury has found for the plaintiff on sufficient evidence. The proof of the fault of the decedent in contributing to the result is negligible.

We find no errors in the record harmful to defendants. Rather, as we have said, the case was submitted to the jury with instructions highly favorable to them.

The judgment and order should be affirmed, with costs.

VAN KIRK, P. J., HINMAN, WHITMYER and HILL, JJ., concur.

Judgment and order affirmed, with costs.