**CHRISTIE et al. v. CALLAHAN.**

No. 7749.

United States Court of Appeals for the
District of Columbia.

Decided Dec. 23, 1941.

Mr. H. Mason Welch, of Washington, D. C., with whom Messrs. John R. Daily and J. Harry Welch, both of Washington, D. C., appeared on the brief submitted for appellant.

Mr. C. Booker Powell, of Washington, D. C., entered an appearance for appellant.

Messrs. Henry I. Quinn and Raymond S. Norris, both of Washington, D. C., submitted for appellee.

Before GRONER, Chief Justice, and EDGERTON and RUTLEDGE, Associate Justices.

RUTLEDGE, Associate Justice.

The only question is whether the evidence was sufficient to sustain the verdict and judgment in plaintiff's favor.[1] The suit was for malpractice. Defendants are physicians, specializing in X-ray work. They treated plaintiff for removal of a pilonidal cyst. He claims they gave him an overdose of X rays which caused him injury.

The question arises in two phases, causation and negligence. Our function is not to weigh the evidence factually as the jury does. It is to decide whether plaintiff's case, as made, was strong enough for us to allow the jury to consider it. To do this we must apply

---

[1] The sufficiency of his evidence was questioned by motion for a directed verdict made at the end of plaintiff's case, a similar motion when all the evidence was in, and motion to set aside the verdict and judgment. All were denied.

some standard. But we cannot weigh plaintiff's case against defendants'. Less than preponderance is sufficient. How much less is hard to state abstractly. Commonly the case weighed, to stand, is required to be substantial,[2] more than a scintilla,[3] such as a reasonable man might believe.[4] All these are just different ways of saying that less than preponderance is required, but the evidence should not be so thin that it would be dangerous for the jury to consider it.

The danger to be guarded against is a too obvious and gross miscarriage of justice, a departure too far from established lines of liability. Facts are primarily within the jury's function. Hence it must be given wide latitude, or trial by jury becomes trial by court. But the jury is not absolute in the realm of fact. Like judges, jurors have weaknesses of emotion and judgment. Unlike judges, they seldom have a background of decision experience against which to check them. Our tradition supplies this through judicial controls. Exclusion of evidence is one. When one side's case is thin, determining its "legal sufficiency" is another. This really means weighing it factually, not for conviction, but for doubt as to the outcome. The verdict sustained therefore represents the jurors' conviction that it is right, and the judge's that it may be right.

The boundary between substance and shadow is hard to draw. Men, including judges, differ about it, always in concrete cases. What is substance to one may be shadow to another. The line cannot be drawn by magic of word or formula. It is not susceptible of generalization.[5] It is always relevant to the issues and the evidence in a particular case. Hence, in the end, a kind of intuitive evaluation must be made, that the verdict does not or would not shock the judicial sense of justice.

What may do this varies with circumstances, the nature of the case, respective difficulties of proof, elements of passion or prejudice present, etc. Absent emotional factors sufficient in themselves for reversal, the case attacked must be taken as true, so far as it goes,[6] and permissible inferences must be drawn in its favor.[7] Given maximum weight, it must leave doubt in the mind of the judge, though it does not convince him that the verdict was right.[8]

Malpractice is hard to prove. The physician has all of the advantage of position. He is, presumably, an expert. The patient is a layman. The physician knows what is done and what is its significance. The patient may or may not know what is done. He seldom knows its significance. He judges chiefly by results. The physician has the patient in

[2] Champlin Refining Co. v. Walker, 8 Cir., 1940, 113 F.2d 844; Heatherly v. Southern R. Co., 5 Cir., 1939, 106 F.2d 894; Schwarz v. Fast, 8 Cir., 1939, 103 F.2d 865; Pryor v. Strawn, 8 Cir., 1934, 73 F.2d 595; Chicago, B. & Q. R. R. v. Kelley, 8 Cir., 1934, 74 F.2d 80; Thoe v. Chicago, M. & St. P. R. Co., 1923, 181 Wis. 456, 195 N.W. 407, 29 A.L.R. 1280.

[3] Jackson v. Capital Transit Co., 1938, 69 App.D.C. 147, 99 F.2d 380; Tobin v. Pennsylvania R. Co., 1938, 69 App.D.C. 262, 100 F.2d 435, certiorari denied, 1939, 306 U.S. 640, 59 S.Ct. 488, 83 L. Ed. 1040; Gunning v. Cooley, 1929, 58 App.D.C. 304, 30 F.2d 467, affirmed, 1930, 281 U.S. 90, 50 S.Ct. 231, 74 L.Ed. 720; Ewing v. Goode, C.C.S.D.Ohio 1897, 78 F. 442; Commissioners of Marion County v. Clark, 1877, 94 U.S. 278, 284.

[4] Walkup v. Bardsley, 8 Cir., 1940, 111 F.2d 789; Champlin Refining Co. v. Walker, 8 Cir., 1940, 113 F.2d 844; Interstate Power Co. v. Thomas, 8 Cir., 1931, 51 F.2d 964, 84 A.L.R. 681; Sandri v. Byram, 6 Cir., 1929, 30 F.2d 784;

Jerke v. Delmont State Bank, 1929, 54 S.D. 446, 223 N.W. 585, 72 A.L.R. 7; Washington Ry. & Electric Co. v. Buscher, 1924, 54 App.D.C. 353, 298 F. 675.

[5] 9 Wigmore, Evidence (3d ed. 1940) § 2494 (II).

[6] Woodburn v. Standard Forgings Corp., 7 Cir., 1940, 112 F.2d 271, 129 A. L.R. 337; Champlin Refining Co. v. Walker, 8 Cir., 1940, 113 F.2d 844; Noble v. United States, 8 Cir., 1938, 98 F. 2d 441. See cases cited in 9 Wigmore, Evidence (3d ed. 1940) § 2495, at 304, note 5.

[7] Chicago, St. P., M. & O. R. Co. v. Kulp, 8 Cir., 1939, 102 F.2d 352, 356, 133 A.L.R. 1445; Tobin v. Pennsylvania R. Co., 1938, 69 App.D.C. 262, 100 F.2d 435, certiorari denied, 1939, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040; Jackson v. Capital Transit Co., 1938, 69 App.D.C. 147, 99 F.2d 380.

[8] 9 Wigmore, op. cit. supra note 6, § 2495; Thayer, A Preliminary Treatise on Evidence (1898) c. 5; Updegraff, A Technique for Determining Legal Liability Based on Negligence (1941) 27 Iowa L.Rev. 2, 30.

his confidence, disarmed against suspicion. Physicians, like lawyers, are loath to testify a fellow craftsman has been negligent, especially when he is highly reputable in professional character, as are these defendants. In short, the physician has the advantage of knowledge and of proof. This increases when he is a specialist.[9] What therefore might be slight evidence when there is no such advantage, as in ordinary negligence cases, takes on greater weight in malpractice suits. On the other hand, malpractice is a serious charge. The physician is not an insurer of health.[10] He undertakes only for the standard of skill possessed generally by others practicing in his field,[11] and for the care which they would give in similar circumstances.[12] He must have latitude for play of reasonable judgment, and this includes room for not too obvious or gross errors according to the prevailing practice of his craft. Generally the standard must be shown by experts and so must the departure from it.[13] But there are cases in which the result of medical or surgical treatment, considered in the light of the circumstances attending and following it, may warrant an inference of negligence.[14]

With these things in mind, we cast the scales, not for preponderance, but for doubt whether the case should stand.

I. Background of Undisputed Facts.

For several years prior to December, 1935, plaintiff had a pilonidal cyst, which erupted like a boil three or four times a year. Otherwise he was in good health, weighing 187 pounds, and went about his work and other usual pursuits. The cyst was located at the lower end of his spine,

over the coccyx. It included the underlying cyst, constituted of hair follicles, a fistula or sinus leading to the surface, and an ulcer or opening in the skin, through which matter discharged. The ulcer was small, about one-fifth of an inch in diameter. The surrounding area was healthy. Late in 1935 a surgeon advised removal. Surgery required hospitalization and interruption of work. With a view to avoiding these plaintiff consulted defendant, Dr. Merritt. He advised X-ray therapy, told plaintiff the effect would be no worse than a bad case of sunburn and would not interrupt his work.

The treatments were given in two series. The first included four given in December, 1935; the second, eleven in February, 1936. The radiation was intended to destroy the hair follicles. Properly administered, it would cause "burn" a little more severe than sunburn, but would not cause necrosis or destruction of tissue.

The treatments were given in a lead-lined room. The irradiated area was in one field surrounding the surface ulcer. The size of the area was governed by the portal used, which was a square-shaped "cone," seven centimeters to the side. When the machine was properly adjusted to the patient, he was left alone in the room, because the cumulative effect of radiation upon the physician or attendant would be harmful. The length of treatment was controlled automatically by an electric clock.

After the treatments, plaintiff suffered excruciating pain in the area exposed. It became reddened, like raw beefsteak, with pus running through the middle, out of

9 Rosenbaum, The Degree of Skill and Care Legally Required of a Medical or Surgical Specialist (1932) 49 Medico-Legal J. 85.

10 Hamilton v. Harris, Tex.Civ.App. 1920, 223 S.W. 533; Sweeney v. Erving, 1910, 35 App.D.C. 57, 43 L.R.A.,N.S., 734, affirmed, 1913, 228 U.S. 233, 33 S. Ct. 416, 57 L.Ed. 815; Coombs v. King, 1910, 107 Me. 376, 78 A. 468, Ann.Cas. 1912C, 1121; Shockley v. Tucker, 1905, 127 Iowa 456, 103 N.W. 360; Ewing v. Goode, C.C.S.D.Ohio 1897, 78 F. 442.

11 Ibid.

12 Ibid.

13 Sweeney v. Erving, 1910, 35 App. D.C. 57, 62, 43 L.R.A.,N.S., 734, affirmed, 1913, 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815. Defendants rely upon this case strongly, asserting it holds that neg-

ligence in X-ray treatment can be shown only by direct testimony of X-ray specialists. But the opinion expressly states: "There are exceptional cases where the result of an operation performed, if unexplained, may warrant an inference of negligence," and cites authorities to sustain this view.

The case was submitted to the jury upon an admission of the defendant physician much less positive than the ones admitted in evidence here, and the jury's verdict was for the defendant. The situation on appeal, therefore, was exactly the converse of that involved here, and there was and could have been no ruling upon the sufficiency of the plaintiff's evidence to sustain a verdict against the defendant.

14 Ibid.

the sinus. Dr. Merritt prescribed narcotics. Plaintiff required and used them continuously, until January, 1937, to keep at work and secure rest at night. His wife, a nurse, administered them almost daily. Physicians applied ointments and salves. Until July, 1936, plaintiff visited Dr. Merritt's office almost daily, for dressing of the ulcer and relief from pain. The record does not show that he saw him during August.

In September, 1936, plaintiff consulted other physicians Previously, in July, he feared a cancerous condition. The Sunday before Labor Day, apparently without Dr. Merritt's knowledge, he went to Baltimore and consulted Dr. Hebb, a surgeon connected with Johns Hopkins University, who advised a surgical operation. On September 4, plaintiff consulted Dr. Merritt about surgeons. Dr. Merritt approved several names, including that of Dr. White, whom plaintiff consulted on September 9. The latter examined him, took his history, and thereafter treated him but did not operate, because he thought it was not safe to do so. He feared cutting might cause the infection to spread and the wound might not heal. Dr. Collins, his associate, assisted in examining and treating plaintiff. On September 10, Dr. Merritt supplied plaintiff with an X-ray photograph of his condition, taken the previous day for Dr. White's use. On September 22 Drs. White and Collins injected in one side only of the X-rayed area a solution containing alcohol, known as Gabriel's solution. The purpose was solely to relieve pain.

Sometime after the X-ray treatments, the skin and tissues in the center of the irradiated area became badly necrosed, began to slough off, and eventually a hole approximately two inches in diameter developed. Proper X-ray treatment would not have produced the sloughing. Just when this occurred is in dispute and is a crucial issue in the case. Defendants say it did not take place until after the alcoholic solution was injected on September 22. Plaintiff says it occurred before that date, and particularly in the early part of September. The evidence on this is squarely in conflict. But all agree that the condition existed on and after October 5, 1936, when plaintiff returned to defendants' office for the first time after September 10. At that time Dr. Merritt found the cyst in an advanced stage of necrosis and, with scissors, cut out the dead tissue.

Plaintiff continued under the care of Drs. White and Collins until January, 1937. His use of narcotics continued and became excessive. His wife recognized this and the physicians discovered he was procuring prescriptions from several simultaneously. Mrs. Callahan stopped giving the injections. Early in January, 1937, Dr. White found plaintiff in a narcotic stupor at his home. On his recommendation, plaintiff was admitted to Chestnut Lodge Sanatorium, in Maryland, for treatment for drug addiction. He remained three or four weeks. The treatment was successful. He has not used narcotics since. The cyst condition also improved at least slightly during this time. His weight had dropped gradually from 187 pounds at the time of the X-ray treatments to 123 pounds when he was admitted. After leaving the hospital he was under the care of Dr. Shearer, a surgeon, for a year. During that time his condition improved, his weight increased and at the time of the trial, in February, 1940, the ulcer appeared practically, though not entirely, healed. Necrosed tissue had been replaced and the surface was covered with scar tissue, in the center of which was a small scab.

## II. The Issues and Theories of the Evidence.

The foregoing facts are substantially undisputed. Upon them and other evidence to be stated, much of which is in conflict, plaintiff contends he received an overdose of X rays and this caused his injury. Defendants say there was no overdosage, their treatment was proper, did not cause the injury, could not have caused it, that it resulted directly and immediately from the injection of Gabriel's solution, and that there was no substantial evidence to the contrary.

In broad outline, plaintiff attempts to show that the X-ray treatments produced a gradually developed and constantly increasing condition of intense pain, necrosis and sloughing of tissue, and enlargement of the ulcer, which reached its height about September 1, 1936, and continued until January, 1937, when he entered the sanatorium. Defendants do not try to prove that plaintiff incurred no injury beyond what natural causes or proper X-ray treatment of the cyst would have

produced. On the contrary, their evidence clearly establishes that necrosis and sloughing took place in excess of what these would have caused. In this respect it was in agreement with plaintiff's evidence. Defendants attempted to show that the cyst and ulcer were healing gradually until September 10, 1936; that suddenly thereafter, and prior to October 5, there was an acute and serious change in plaintiff's condition, and that this could not and did not occur without some intervening treatment. Their view consequently is that the injection caused the injury.

There is, therefore, no question in the case concerning the existence of injury.[15] The basic issue is what caused it. This resolved, the question of negligence becomes relatively simple. If X rays caused the injury, there must have been an overdose. The question as we have it boils down to whether, on the plaintiff's evidence or the case as a whole, there is substantial basis for believing that the X-ray treatments caused the injury. Keeping this in mind, we must burden the opinion, unfortunately, with a detailed discussion of the evidence, given by both parties, which in large part is conflicting.

Plaintiff relied largely upon the testimony of surgeons, Drs. White, Collins, Hebb and Shearer, of himself and his wife, and cross-examination of defendants' expert witnesses, X-ray specialists. Defendants' case was built principally from testimony given by the last, Drs. Merritt, Belair and Hynes, the latter two disinterested.

### III. The Conflicting Evidence.

Plaintiff's evidence concerning his pain and suffering, consequent use of narcotics, frequency of his need for professional attention, fear of malignancy, and final resort to surgeons has been stated partially. The pain followed immediately on the treatments, was excruciating, constant, continued through and beyond October, and was relieved only by constant injection of narcotics and application of sedatives.[16] Concerning his condition in the spring of 1936, after the X-ray application, Mrs. Callahan testified: "It was very bad, and looked very much like a bad sunburn, and there was seepage under the skin. From time to time it began to get worse, and began to slough off * * * and this place became very large." She said that in March "a lot of the skin was sloughing away, and there was quite a hole in his back * * *. It was red and oozing under the flesh, and the secretions were forming. The flesh had sloughed away at that time."

Both plaintiff and his wife testified that they became gravely concerned over his condition in July. Plaintiff feared it had become cancerous, testified he expressed his fear to Dr. Merritt, who assured him the cyst was not malignant, that he had burned it all out, and what he had to do was to heal up "the atrophic ulcer" caused by that burn. Mrs. Callahan testified she also became "terribly worried" about her husband's condition in July, called Dr. Merritt by telephone, told him of her concern, that she wanted her husband to go with her on vacation in August or September, and Dr. Merritt replied: "Unfortunately that he had given Mr. Callahan too much burn, but he would be all right * * * by then." Dr. Merritt denied the telephonic conversation with Mrs. Callahan and the statements she attributed to him. He also denied the conversations with Mr. Callahan, and the statements allegedly made in them, though he admitted seeing him in July at times not shown by his records.

Early in September plaintiff's concern led him to seek surgical advice. He first saw Dr. Hebb, who advised a surgical operation, and described plaintiff's condition on the Sunday before Labor Day as "a pilonidal sinus * * * opening of one or one-and-a-half inches, with a whitish edge around the edge of ulceration," and stated that the flesh in the ulcerated area was "swollen, sloughed like * * * had some sloughing—red * * * I would call that necrosis * * * about one by one-and-a-half inches." The skin around the sloughed area was "red and swollen."

After consulting Dr. Merritt on September 4, plaintiff went to Dr. White on the 9th, and Dr. White and Dr. Collins examined him. Dr. White testified plaintiff then had "an ulcer * * * lack of tissue * * * a hollow place * * * one inch by three-fourths." Outside this was "a red area about two inches around." The ulcer and this area measured "all together

---

[15] See note 21 infra.

[16] See Collwell and Russ, X-ray and Radium Injuries (1934) 31 ff., for studies showing the excruciating pain of patients following overdosage of X rays.

three or four inches." The ulcer had been "sloughed out. Nothing necrotic about it then. It looked inflamed. We felt there might be some diseased tissue." On redirect examination, he said: "I did see a hole that sloughed, and a red area around it." Dr. Collins described the ulcer as "one inch by three-fourths in size, with a grayish sloughing base"; the "red and inflamed" area around it as three inches by four inches in size. As stated previously, they concluded an operation would be dangerous and did not perform one or use any surgical measures.

From the history given by plaintiff, and presumably from the examination, Dr. White diagnosed the case as "an infected area and X-ray burn, and a question mark after it." He treated plaintiff "for infection and anything that could possibly refer to X ray," but stated frankly, "I did not know the cause and I was grasping around for anything that could give relief." He said further, in the cautious manner of physicians, "I don't know whether he had an X-ray burn or not. I saw that there was some sunburn matter, and in fact this gentleman had something that would come under X ray, and I talked to Dr. Merritt about getting some salve for treatment of X ray." Also, "I assumed he had a pilonidal cyst treated by X ray. I didn't know what X ray had to do with it."

Dr. Collins testified that without a history he could not have said the lesion was an X-ray lesion or burn. He had seen similar ulcerated areas where he did not know of previous X-ray treatment. But he stated plaintiff gave a history, including information about an X-ray burn, "which was very helpful," and he obtained and used in treating him a preparation claimed to be beneficial in treating X-ray burns.

Both Dr. White and Dr. Collins disclaimed qualification to speak concerning propriety of X-ray therapy, and refused to state directly that the X-ray treatments caused the necrosis here. But they did not exclude it as a possible cause.

On September 22 Dr. White and Dr. Collins injected the Gabriel's solution. The injection was made on one side only of the infected area, "to see if it would give relief * * * it had no effect."

Both Dr. White and Dr. Collins testified positively and repeatedly that the injection made no difference in the condition of the cyst, the ulcer or the surrounding area; that it did not affect the necrosis either by improving or making it worse; and that there was no substantial change in plaintiff's condition while he was under their care, that is, from September 9 to the January following.[17]

Dr. Collins also testified that Gabriel's solution does not cause or aid in sloughing off tissue and had never done so in their experience; but that pure alcohol (100%) may cause sloughing. If the injection had caused it, "one side would have dug out further than the other side, because we used it on only one side," whereas the sloughing here was symmetrical. He said that it "could not go over to the opposite side where it had not been injected," but "could seep only to the midline"; "could not go clear around because there would not be enough of it"; that nothing in the area indicated the injection should not be made.

Mrs. Callahan testified, on cross-examination, that between September, 1936, and October, 1936, "there came a time when a great deal of that tissue sloughed out." But she also said that plaintiff's condition as shown by an X-ray picture taken in November or December, 1936, was the same as on September 9, when plaintiff first saw Dr. White—that there was "no change."

Dr. Shearer treated plaintiff for a year from February 5, 1937. In February, 1937, he said, plaintiff had an open wound at the base of the spine, approximately two inches in diameter. There was no skin, a great deal of redness, swelling, a

---

[17] Dr. White said there was no particular change "during any time we treated him"; "I didn't see any difference," "could see no difference in dissolving of diseased tissue" after the injection of Gabriel's solution; "we may have accomplished something in the way of healing, not a great deal"; "the last time I saw him, I thought there might be some slight improvement"; that there was nothing in plaintiff's condition "that would work medically contra to the solution."

Dr. Collins testified that the injection had no effect on the area "in the way of breaking up any necrosis"; that it did not improve the condition or make it worse, "did not change appreciably."

base covered with very thick, almost cartilaginous type of tissue. The wound had dead tissue in it. The necrosis was not around the wound, but at its depth. Plaintiff stated to him that the wound developed after the X-ray treatments and had been very much worse. "From his history" Dr. Shearer's diagnosis "was that it was caused by an X-ray burn." Asked "To what degree?" he replied, "It was bound to be a third degree—the type it was would make it a third-degree burn." He testified plaintiff's condition was very much better in February, 1938, but he advised him to have skin grafted on by surgical operation. He admitted frankly, in response to inquiry as to how X rays are supposed to affect the cyst area to bring about a cure, "I don't know anything about the X ray on a pilonidal cyst." He said there was no evidence of any cyst, i. e., of the continued existence of the hair follicles and their activity, in February, 1937, or during his treatment. He stated his opinions "that the area will completely heal without an operation," and "from my observation and what I know of these conditions subsequent to X ray, I think it can heal just as this man's is now," i. e., at the time of the trial.

Defendants' case rests, as to the facts concerning the treatment actually given, its consequences, and plaintiff's condition from time to time, almost exclusively on Dr. Merritt's testimony. The opinions of the other X-ray experts, Drs. Belair and Hynes, were based on it, as were his own. They had no direct knowledge of the facts.

Defendants' Exhibit 1 was a chart or record kept in their office, which purported to show exactly the X-ray treatments given to plaintiff, as to dates, time and quantity of exposure, etc. Dr. Merritt testified that it accurately reflected the treatments actually given. He also said they were not excessive; could not have caused necrosis; gave no destruction or necrosis here; did not cause a "third-degree burn"; were intended to destroy the hair follicles; that X-rays sufficient to do this will not destroy tissue, if properly applied, but will cause burn a little more severe than sunburn, not greater; that in some treatments, as for cancer, the purpose is to destroy tissue, but not in treating a pilonidal cyst; that in applying X-ray therapy the physician does not guard against burn, since it is necessary in most cases, but does guard against necrosis.

He also testified that if X-rays had caused the necrosis which occurred in this case, the entire area irradiated, that is, 49 square centimeters, would have been necrosed, whereas this occurred in only the central portion; that there is a slight difference in intensity of radiation at the outer edge and the center of the area treated, but this is negligible for all practical purposes and necrosis would occur equally throughout the exposed area.

Dr. Merritt further said that trophic ulcers often result from X-ray burns and an overdose to the extent of a "third-degree burn"[18] will cause necrosis and necrotic ulcer; that he could not tell at any time how long it would take the whole ulcer to heal, but if there were no overdosage, under the treatment given, and reaction was normal, there would be a reaction in about twenty-six days, which would clear up in from three to six weeks. His opinion was that he did not succeed in destroying the cyst, though at one time he thought recovery was on the way. He was present at more than half the treatments, the others being given by associates.

Accepting the facts as Dr. Merritt stated them, Drs. Belair and Hynes, X-ray specialists, gave testimony which, in the main, substantiated these views. They concurred that the treatment disclosed by defendants' Exhibit 1 was "proper treatment," "excellent treatment" for pilonidal cyst; would not cause necrosis or kill tissue; that intensity of radiation is slightly greater in the center than at the periphery of the area irradiated, but this has no practical consequences; if X rays caused necrosis, as applied here, the entire area would be necrosed, and the necrosis would occur throughout it at the same time; that, absent any other treatment, necrosis would appear in one to three months, but not later; that "true X-ray burns" do not heal; that tissue burned out is not replaced by growth; there is nothing to do about an overdose, except to stop the treatments

[18] He and the other X-ray experts objected to the term "third-degree burn by X ray." He stated: "That is not correct terminology. There really isn't any such thing, but for the purpose of expediting this examination, I will say yes, sir." The answer was in response to a question whether necrosis comes from a third-degree burn by X rays. .

and apply ointments; that the treatment was not an overdose, if given just as shown on defendants' Exhibit 1.

Dr. Belair stated a sufficient application of X rays would kill tissue; an overdose frequently causes necrosis; that if there were no overdosage, no necrosis, and the X rays destroyed the hair follicles, healing might require a year or eighteen months but not four years, and that there would not be a hole two-and-a-half to three inches fourteen months after the first treatments; that after such a time, if all other factors were normal and there were no intervening treatment (such as the injection), the presence of such a hole, where flesh had sloughed away, with moisture remaining, would indicate an overdosage.

Dr. Hynes testified that if there is no overdose, the area treated should not be more painful than a severe sunburn or require drugs or narcotics for relief, but if there is an overdose in an ulcer formation, the patient undergoes a very painful experience and may require narcotics; that without overdosage for pilonidal cyst, an irradiated area the size of plaintiff's should clear up entirely in six weeks. He qualified this, however, by stating that if an ulcer were present, there would be no way to foretell how soon the ulcer might heal.

It remains to set forth the defendants' evidence concerning the condition of the cyst from time to time, particularly in September and October, 1936, and the effects of the surgeon's injection of Gabriel's solution. As has been stated, defendants attempt to show that the cyst improved gradually from the time of the treatments to September, 1936, but suddenly became gravely worse in the latter part of that month or early in October, after the solution was injected, and that this caused the injuries here.

Consistently with this thesis Dr. Merritt denied the conversations with Mr. and Mrs. Callahan in July and the statements they attributed to him. He testified that on September 4, when he saw plaintiff, the ulcer was getting better and smaller. It was a "small ulcer, filling in gradually from the bottom. Still has considerable pain * * * like sharp toothache, but does not last long." He stated that the ulcer was not trophic before plaintiff saw Dr. White; none of the area surrounding the original ulcer was necrosed on September 9; only a small area was necrosed in December, 1935, and none of the area surrounding the ulcer; in June, 1936, the ulcer measured one-fifth of an inch, and healing had progressed to an extent; on September 4 the ulcer was small, probably the same size; "on one occasion we were led to believe we were on the way to a successful recovery"; and that in September, 1936, there was no necrotic tissue, "unless the margins of the ulcer could be considered necrotic tissue."

Dr. Merritt also saw plaintiff on September 9. He did not see him again until October 5, when he found plaintiff in "an advanced stage of necrosis"; the size of the ulcer had increased, "now measures 4 x 5 cm * * * considerable area of the soft parts will slough off."[19] He testified that the situation before and after plaintiff went to Dr. White "was not comparable at all"; "the condition had become worse and there was a trophic ulcer area much enlarged and necrosis had set in"; that without injection of some substance the area could not have been necrosed as it was. Plaintiff testified that Dr. Merritt cut out dead tissue on October 5 and said: "There is a good deal of tissue sloughing here and I have to clean this up"; also that he said the condition was worse than when he last saw it.

Dr. Merritt refused to state directly that he implied Dr. White's treatment "was incorrect for what he [plaintiff] had," but did say he would have advised against it. He testified that plaintiff's condition in October (as he saw it) "was due to treatment gotten elsewhere, and not due to X ray"; that without injection of some substance the area could not have been necrosed as it was then; the necrosis came from some treatment he got between the time he saw plaintiff on September 9 and the time he saw him again on October 5; any injected agent would have caused

---

[19] His records for October 5 showed the following entry: "October 5, 1936, trophic ulcer; midline sacrum with undurated zone on either side, due to some injected substance for local anesthetic; has been seen and treated by Dr. White * * * *without our knowledge*, and some one injected some substance into the lesion *on either side* with the idea of controlling pain. *This has increased size of trophic ulcer*, and it now appears that a considerable area of the soft parts will slough off. The ulcer now measures 4 x 5 cm." (Italics supplied)

the necrosis in that time, such as "cold water, alcohol injection, or anything else." His idea "was that necrosis was due to the injection that someone else gave him." His record entry for October 5, set forth above, clearly implies the cause was Dr. White's injection.

Dr. Belair supported Dr. Merritt's views as to the effect of the alcoholic injection, but Dr. Hynes gave a very qualified opinion concerning this. Both based their opinions upon Dr. Merritt's statement of the facts. The hypothetical questions included the factor of alcoholic injection under circumstances identical with that made here according to defendants' version of the facts, including plaintiff's previous condition. On the basis of these assumed facts, Dr. Belair testified that in his opinion the sloughing was due to the injection of the Gabriel's solution; that the injection of any solution in the X-rayed area is "definitely inadvisable"; that Gabriel's solution injected into the area could have caused the sloughing; that the sloughing would appear normally in four to six weeks, might appear in one; that Gabriel's solution injected on one side of the infected area could come around on the other side, depending upon the quantity used; but that he had not known of and was not familiar with injections made in the infected area of a pilonidal cyst treated by X rays.

Dr. Hynes gave his opinion that injection of Gabriel's solution in the area would aggravate the sloughing, if necrosis were already present, but could not answer definitely whether it would break down tissue that had not already been necrosed.

### IV. Causation.

The only X-ray specialists who testified gave their opinion that the X rays were not and could not have been the cause of the injury. They attributed it to the alcoholic injection. Defendants say that only X-ray experts are qualified to testify concerning X-ray treatments and their effects. Hence they conclude there was no evidence to sustain the verdict.

The X-ray experts' testimony was based exclusively on the facts as Dr. Merritt stated them and assumes his version was true. And the argument that only X-ray men are competent to testify assumes that his version was not contradicted by substantial evidence.

The assumption is erroneous. His statement of what took place is contradicted in crucial respects by other evidence which, if taken as true, destroys the effect of his views not only on causation but on negligence in this case. With his own, the testimony of the other X-ray men falls, since they have the same factual foundation.

Defendants have constructed their case so that if their theory of causation fails, the plaintiff's must prevail—in fact, is strengthened by their evidence. Plaintiff and defendants agree in one vital respect —that he incurred harm beyond what natural development of the cyst or proper X-ray treatment would have caused or did cause. Defendants' evidence is as emphatic as plaintiff's in this respect. It is an essential element in their case as they made it. There is therefore no dispute as to the existence of harm or, substantially, as to its extent. Both sides agree that the cyst attained an advanced stage of necrosis and that proper X-ray treatment would not have caused this. The difference is as to when it existed, and this has controlling effect in determining what was its cause. Plaintiff says it existed prior to September 22, when the alcoholic injection was made. Defendants say it did not exist until after that time.

The record presents only two probable causes, the X rays and the injection.[20] There is no evidence that any other brought about the injury in this case. As it has been presented, one or the other must have produced the injury. There is no room on the record for a third possibility which is anything more than conjecture, disconnected from the facts as

---

[20] Theoretically a third possibility might be the two in combined effect. But on the record as made this would be merely another way of saying that the injection was the cause. Defendants do not deny that the X rays had some effect. But they say it was only "indirect." They do not contend that the alcohol injected into tissue not irradiated would have produced the injury. They say, rather, that the radiation without the alcohol would not have caused it, and therefore it was the injection in the otherwise healing irradiated area which did cause it. Plaintiff says, and gives evidence to show, the alcohol had no effect whatever.

proven by both sides.[21] If the injury did not exist prior to the injection, it may have been the cause. If it existed before that time, the injection could not have caused it and the X rays must have done so. If they did, there must have been an overdosage. The crucial issue in the case, therefore, is whether the injury existed prior to September 22. As it comes to us it is whether there is substantial evidence showing that it did.

On this, there can be no question. The testimony of plaintiff and his wife concerning his condition and progress from March to early September squarely conflicts with Dr. Merritt's version. Their view has support in plaintiff's constant need and use of drugs, Dr. Merritt's prescription of them, the testimony of the X-ray specialists that proper radiation in cases of this kind creates no more harm than a bad case of sunburn and does not require use of narcotics, the testimony of Mrs. Callahan that she observed sloughing in the spring or summer of 1936, the absence of direct medical testimony that sloughing did not occur prior to September 1 of that year, the fears expressed by the Callahans in July, and finally their evident concern shown by resorting to surgeons in September, and the surgeons' refusal to operate because of the danger of spreading the infection.

Dr. Merritt's testimony regarding the condition of the cyst early in September clashes directly with that of Drs. Hebb, White and Collins. He said the ulcer then was small, about the same size as when treatments began (one-fifth of an inch), not trophic or necrotic, healing, filling in from the bottom, in other words, was improving and apparently well on the way to recovery. The surgeons, however, found it much larger, measuring from one to one-and-a-half inches, sloughing or trophic, surrounded by an inflamed and infected area

---

[21] There is slight evidence, elicited on cross-examination of the surgeons, not from the X-ray experts, that a pilonidal cyst *could* develop solely from natural causes to approximately the size, degree of sloughing and other symptoms which plaintiff's attained at its height, though one surgeon said he had never seen one quite so large develop in this way. But there is no evidence that plaintiff's cyst did in fact develop in this manner. Neither the X-ray experts nor the surgeons were asked whether, or expressed opinions that, the cyst at its height arose from natural causes. Such a theory would be in direct conflict with the theories and the evidence produced by both sides. Defendants' evidence, if believed, establishes that the injury could not have arisen solely from natural causes in this case. It was to the effect that the cyst improved steadily, though slowly, until the injection occurred, then suddenly became much worse, and the necrosis at its height could not have arisen in the absence of the injection or some other intervening treatment. They made no effort to prove, alternatively, that the maximum condition existed prior to the injection and came about exclusively from natural development. The reason for this is plain—it would have discredited their view and their evidence that the injection was the cause.

On the other hand, plaintiff's evidence, if believed, establishes that the cyst became worse pronouncedly and immediately after the X-ray treatments, continued to do so constantly, and reached its height before the injection was made. These facts, taken in conjunction with the other evidence favorable to the plaintiff set forth above, clearly established that the X rays were the probable cause. The surgeons' testimony that a cyst *could* reach such a stage from natural causes under circumstances not defined and not related to the facts shown to exist in this case is not proof that it did arise in fact from such causes in this case. In view of the evidence, whether plaintiff's or defendants', and the absence of effort by either side to show that natural causes did produce the injury here or to connect that possibility with the facts of the case, the idea that the necrosis at its height arose from natural causes is no more than a speculative possibility unrelated to the facts in proof. Had it been more, it still would have been a matter for the jury's judgment whether the condition was so produced or was caused by the X rays. It is not necessary, either on causation or on negligence, for the plaintiff to negative every speculative possibility or to do more than establish the cause upon which he relies as a probable one. If on the evidence there is more than one probable cause, it is the jury's function to decide between them. In this case there were two, the X rays and the solution. Natural development was not supported by any of the evidence as a probable cause. Cf. notes 31 and 32 infra.

of two inches or more, and in such condition that Drs. White and Collins declined to operate.

Dr. Merritt and the surgeons differed diametrically also as to whether there was pronounced change between September 10 and October 5. He said there was, stating the cyst was in an advanced stage of necrosis on the latter date. Drs. White and Collins testified positively and repeatedly that there was no change in that period or afterward during the three months or more plaintiff remained under their care.

The surgeons also stated unequivocally that the alcoholic solution did not and could not cause the injury which occurred here. Dr. Merritt and the other X-ray men expressed the contrary opinion.

Without going further in detailed comparison, we need only point out that the conflict in the evidence is both sharp and substantial in the following respects: (1) Whether plaintiff's condition was gradually improving or becoming worse prior to September 1, 1936; (2) the condition of the cyst on September 9, as to size of the ulcer, presence and amount of necrosis, whether it was healing; (3) whether there was substantial change between these dates and October 5; (4) the general effects of Gabriel's solution in causing necrosis and sloughing in infected areas; (5) its effect in causing them here; (6) whether the injection made on one side only of the infected area could go over to the opposite side, so as to cause the symmetrical necrosis which took place rather than sloughing on one side only; (7) whether the condition of the cyst at the time of injection was such that it would work medically contra to the solution; (8) whether Dr. Merritt stated to Mrs. Callahan in July that unfortunately he had given her husband too much burn or X rays, and to him that he had burned out all the cyst and what he had to do was to heal up the atrophic ulcer caused by that burn.

In all these respects the evidence for plaintiff directly contradicts Dr. Merritt's relation of the facts. The difference is basic. If Dr. Merritt was right, his treatment was both proper and beneficial, the harm could not have been caused by the X rays, and must have come from the injection. If the surgeons and the Callahans were right, Dr. Merritt's whole theory of the case is exploded. The injection could not have caused the harm and it could have arisen only from X-ray exposure. In that event, the exposure must have been excessive to produce the consequences which existed.

On the facts in these respects the case is one of Dr. Merritt against Drs. Hebb, White, Collins and the Callahans. To sweep aside their testimony as insubstantial would be to take odds of one to five. All had opportunity to observe the condition of the cyst at the times concerning which they testified, to see symptoms of improvement or the contrary, and (except Dr. Hebb) to watch the effects of the injection. None of them was impeached for credibility or otherwise. Their testimony was not only substantial, it was highly credible.

It should not be necessary to point out that surgeons are as competent to testify concerning their methods and the effects they produce, generally or in the particular case, as are X-ray men to testify concerning their own, or that the issue here is not limited merely to the effects of the X rays, but involves equally and alternatively those of the injection of Gabriel's solution. We think, too, that surgeons are as competent to observe the general condition of infected areas, to describe them and testify concerning them, as are X-ray specialists. It does not require a knowledge of X-ray therapy to measure the size of an open ulcer, determine whether it is increasing or decreasing, ascertain whether it is necrotic or trophic or estimate the amount of sloughing. In fact, the defense relied upon the testimony of Dr. Halley, not an X-ray expert, to show the condition of the cyst in January, 1937. The surgeons were at least as fully qualified as the X-ray men, also, to state the general effects of the use of Gabriel's solution, with which the record shows they were familiar and the X-ray men were not, in causing necrosis and sloughing, and to observe and report upon the actual effects of the injection in that respect in this case. The X-ray men are experts in X-ray therapy and its consequences. But that does not disqualify surgeons, who are also medical experts, from testifying either as to matters of common medical knowledge or the use and effects of methods and materials with which their work familiarizes them.

We think therefore that the surgeons were fully as competent as Dr. Merritt and the other X-ray specialists to testify concerning the condition of the cyst, before and after the injection, the characteristics of Gabriel's solution, its consequences, actual and usual, and to observe

and state whether such a change as Dr. Merritt described took place when he said it did. Their testimony clearly was sufficient to raise doubt in a reasonable mind, lay or legal, as to the correctness of his version of the facts in all of the respects concerning which they were in conflict.

Their version, if accepted, made inapplicable to the case much of the opinion evidence given by the X-ray specialists, whose views on the causal problem assumed a quiescent and healing condition of the ulcer before September 22, an immediate and violent change thereafter, and an advanced stage of necrosis on October 5. On these premises they attributed the necrosis to the injection, exonerated the X-ray treatments. The premises have been made inapplicable by the verdict. The opinions founded on them fall with them. The X-ray specialists were not asked to give and did not express opinions concerning what caused the injury, if the condition which Dr. Merritt said existed on October 5 did in fact exist prior to September 22.

There was, however, some evidence apart from the facts as stated by Dr. Merritt that the X rays could not have caused the injury which existed here. This consisted in the opinions expressed by the X-ray men that if the X rays had been the cause, necrosis would have occurred at one time throughout the exposed area of forty-nine square centimers, would have reached its height within ninety days, and the tissue so lost would not have been replaced by growth.[22] There is no conflict as to the facts that the sloughed area at its maximum did not include the whole area exposed and that the lost tissue has been replaced to some extent by scar tissue.

This evidence was highly convincing. But we do not think it can be given such weight as a matter of law as to outweigh all of the evidence in favor of plaintiff. To do so would require ignoring equally convincing evidence in his behalf that the kind of necrosis which occurred here existed prior to the injection and could not have been caused by it. There is no evidence contradicting the fact that the solution was injected on only one side of the ulcer, and Drs. White and Collins testified that it could not go beyond the midline, or more than half around, so that if the necrosis had been caused by the solution, it would have occurred on one side only, not symmetrically as it did occur. Dr. Collins stated directly that not enough of the solution was used to go all the way around. There was no evidence to contradict this. Dr. Belair thought the solution could go all the way around, if injected in sufficient quantity, but he qualified this by stating his own unfamiliarity with the use of Gabriel's solution and in other respects. The case is one therefore in which the jury, whatever its decision, had to disregard expert testimony that the lesion which occurred could not have been caused by the agency concerning which it was given. Furthermore, Dr. Shearer, a surgeon, testified that according to his experience X-ray burns "can heal just as this man's is now," i. e., at the time of the trial. We think it cannot be said, as a matter of law, that the X-ray experts' opinions carried so much weight in this respect as to require the jury to accept them and disregard the surgeons'.

As the case has been presented, the evidence that the injection did not and could not cause the injury is sufficient to establish that the X rays did cause it. The record discloses no other possible cause and there is no other explanation for the existence, prior to the injection, of the necrosis which did exist, according to the verdict, in this case. But, though it is inconsistent with some portions of the evidence given for defendants, there is other evidence that the X rays could have caused and did cause the necrosis here. All of the X-ray experts testified that overdosage of X rays will cause necrosis and necrotic ulcer; that proper treatment for pilonidal cyst requires "burn," but not enough to cause necrosis, or more than severe sunburn will produce; that if there is no overdose and the reaction is normal, it will clear up in from three to six weeks, although if an ulcer is present there would be no way to foretell how long healing might require. Dr. Belair testified that if there were no overdosage, no necrosis, and the X rays destroyed the hair follicles, healing might require a year or eighteen months, but not four years, and there would not be a hole two and one-half to three inches after fourteen months; that after such a time, if all other factors were normal and there were no intervening treatment, the presence of such a hole, where flesh had sloughed away, would in-

[22] See, however, concerning the matter of healing, Gray, Attorneys' Textbook of Medicine (2d ed. 1940) 844, 845; Pohle, Theoretical Principles of Roentgen Therapy (1938) 217.

dicate an overdosage. Dr. Hynes testified that if there is no overdose the area treated should not be so painful as to require narcotics for relief, but if there is an overdosage in an ulcer formation the experience is very painful and may require narcotics. Dr. Merritt testified that he did not think he succeeded in destroying the cyst, though at one time he thought recovery was on the way, but the evidence concerning the condition at the time of the trial would support the conclusion that the cyst had been killed, as does Dr. Merritt's own statement to plaintiff in July, 1936, if it is believed that he made it.

This evidence, it is true, was given upon the assumption, now negatived by plaintiff's evidence and the verdict, that necrosis to the extent found by Dr. Merritt on October 5 did not exist prior to September 22. Considered, however, on the contrary one, it lends weight to the view that an overdose of X rays was given and caused the necrosis. In that view, there was necrosis, it was in an advanced stage, it existed prior to the injection; overdosage of X rays can cause it; proper treatment does not cause it, or more than severe sunburn; if there is no overdose, normally the reaction should clear up in three to six weeks, not later, and narcotics should not be required to relieve the pain. If the treatment were proper and destroyed the hair follicles, healing might require eighteen months, but there would not be a hole of two and one-half to three inches after fourteen months, absent intervening adversely affective treatment. On the facts as found by the jury and substantiated by plaintiff's evidence, the injection had no effect whatever on the condition of the cyst, there was a hole of the size stated after fourteen months, there was intense and unbearable pain continuously for a year or more from the time of the treatments, narcotics were required to relieve it, were prescribed by Dr. Merritt for months, and it was reasonably inferable that the X rays succeeded in killing the hair follicles.

The surgeons did not express a positive opinion that the X rays caused the injury. They considered themselves not qualified to do so. But they did not exclude it as a possible cause, and Drs. White and Collins, in view of plaintiff's history, made a tentative diagnosis of "an infected area and X-ray burn, and a question mark after it." They also treated the cyst appropriately for overdosage of X rays, consulting with Dr. Merritt in doing so. Dr. White disclaimed knowing whether plaintiff had an X-ray burn, but he also said: "I saw there was some sunburn matter, and in fact this gentleman had something that would come under X ray, and I talked to Dr. Merritt about getting some salve for treatment of X ray." Dr. Collins testified that without the history he could not have told whether the lesion was caused by X rays, but that the history plaintiff gave was "very helpful."

Finally, Mrs. Callahan testified, on direct and cross-examination, that Dr. Merritt told her in July "unfortunately that he had given Mr. Callahan too much burn," "unfortunately he had given him too much X ray," but "he would be all right." Considered apart from the other evidence sustaining plaintiff's case, this contradicted admission *might* not be sufficient for submitting the case to the jury.[23] As to this we express no opinion. But taken in conjunction with that evidence, it was entitled to weight.[24] Mrs. Callahan's veracity was not impeached. She was a straightforward and seemingly honest witness. She testified to facts unpleasant and embarrassing for her to acknowledge. A busy physician easily could forget, after four years, a telephonic conversation with a patient or his wife in the course of the day's routine. The patient or his wife would be more likely to remember it. The jury has elected to believe Mrs. Callahan rather than Dr. Merritt. We cannot say it should not have been permitted to do so. We think, too, the statement was an admission of want of proper care. That Dr. Merritt so construed it is shown by his denial that he had made it. Otherwise he might well have rested upon the statement that he did not remember making it.[25]

---

[23] Morgan, Admissions as an Exception to the Hearsay Rule (1921) 30 Yale L.J. 355; 4 Wigmore, op. cit. supra note 6, § 1048; 7 Id. § 2094; Chafee, The Progress of the Law, 1919–1922 (1922) 35 Harv.L.Rev. 428; McKewen v. Cotching, 1857, 27 L.J.Exch., N.S., 41; Zandan v. Radner, 1922, 242 Mass. 503, 136 N.E. 387; Farnham v. Clifford, 1917, 116 Me. 299, 101 A. 468; Caswell v. Maplewood Garage, 1930, 84 N.H. 241, 149 A. 746, 73 A.L.R. 433.

[24] Ibid.

[25] The record shows the following on direct examination of defendant by his counsel:

On the evidence we have recited at such length, we think the jury was justified in concluding that the defendants administered an overdosage of X rays and that this was the cause of the necrosis which constituted, with the attendant pain and expense, plaintiff's injury. The evidence supporting their verdict clearly was substantial.

## V. Negligence.

It is not necessary to discuss the evidence further, except very briefly, upon the question of negligence. What has been said in regard to the issue of causation shows sufficiently there was ample evidence to sustain the jury's finding that the defendants were negligent. By the same evidence which establishes that the injury was caused by overdosage of X rays, negligence is proved.[26]

That is true, notwithstanding all the X-ray experts testified the treatments as described by Dr. Merritt were proper. He based his judgment upon his own knowledge and version of the facts. The other X-ray men based theirs upon his statement of the facts, including not only those which described the treatments given, but those which stated their consequences and plaintiff's condition from time to time. They explicitly qualified their statements that the treatments were not negligent by the condition that this would be so if the treatments actually were given exactly as Dr. Merritt stated they were. But if that were true,

there could have been no overdosage and no necrosis of the degree which existed here prior to September 22. The X-ray experts' opinions concerning the existence of negligence are consistent with the facts of the treatment given, as they were stated by Dr. Merritt. The vice in them is that these facts are not consistent with the facts which show that the injury existed before the injection of Gabriel's solution was made. In short, all of the evidence which sustains the jury's finding on the question of causation, in the peculiar circumstances of this case, sustains it as to negligence. The jury must have found that the treatments were not given exactly as Dr. Merritt testified they were, and that, unfortunately, he gave more than the amount proper for treatment of pilonidal cyst. We cannot say that the evidence to support this conclusion was insubstantial.

The opposing view appears to be based on the theory that negligence in X-ray treatments can be shown only by direct and positive testimony of X-ray specialists to specific acts of negligence taking place in the course of the treatment. A burden so heavy is not required either by the general law of negligence or by the Sweeney case.[27] Generally speaking, direct and positive testimony to specific acts of negligence is not required to establish it. Circumstantial evidence is sufficient, either alone or in combination with direct evidence.[28] Circumstantial evidence may contradict and overcome direct and positive

Q. "Do you remember talking to Mrs. Callahan over the telephone about Mr. Callahan's treatment?" A. "No, sir."

Q. "Did you ever talk to Mrs. Callahan at any time and tell her that you had given Mr. Callahan, her husband, too much X-ray treatment?" A. "No, sir, I did not."

It is intended, by this quotation, not to imply that Dr. Merritt was inconsistent in his testimony, but that he and his counsel regarded it as important to have him deny making the admission.

26 Cf. Magruder, Book Review (1931) 45 Harv.L.Rev. 412, 417.

27 Cf. note 13 supra. The development of X-ray therapy has reached the stage of an exact science. Gray, Attorneys' Textbook of Medicine (2d ed. 1940) c. 44. Because of this there is much authority applying the doctrine of "res ipsa loquitur" to "third-degree burns" caused by X rays. Lewis v. Casenburg, 1928, 157 Tenn. 187, 7 S.W.2d 808, 60

A.L.R. 254; Casenburg v. Lewis, 1931, 163 Tenn. 163, 40 S.W.2d 1038; Shockley v. Tucker, 1905, 127 Iowa 456, 103 N.W. 360; Evans v. Clapp, Mo.App. 1921, 231 S.W. 79. The cases which hold that res ipsa loquitur cannot be applied on a showing of X-ray burn are not cases in which it appears that the burn was of the third-degree type. E.g., Runyan v. Goodrum, 1921, 147 Ark. 481, 228 S.W. 397, 13 A.L.R. 1403; Stemons v. Turner, 1922, 274 Pa. 228, 117 A. 922, 26 A.L.R. 727. See notes, 1921, 13 A. L.R. 1414; 1923, 26 A.L.R. 732; 1928, 57 A.L.R. 269; 1929, 60 A.L.R. 259.

28 National Biscuit Co v. Litzky, 6 Cir., 1927, 22 F.2d 939, 942, 56 A.L.R. 853; Sears, Roebuck & Co. v. Peterson, 8 Cir., 1935, 76 F.2d 243; Faulkinbury v. Shaw, 1931, 183 Ark. 1019, 39 S.W. 2d 708, 710; Hogan v. Comac Sales, Inc., 1935, 245 App.Div. 216, 219, 281 N.Y.S. 207, 211, affirmed, 1936, 271 N. Y. 562, 2 N.E.2d 695.

testimony.[29] The limitation on its use is that the inferences drawn must be reasonable.[30] But there is no requirement that the circumstances, to justify the inferences sought, negative every other positive or possible conclusion.[31] The law is not so exacting that it requires proof of negligence or causation by testimony so clear that it excludes every other speculative theory.[32]

 The Sweeney case does not deny these principles. Indeed, it appears to go further than they do and recognizes that in exceptional cases the results of medical or surgical treatment may be so gross in departure from those normally produced by competent and proper treatment that in themselves they are sufficient to sustain an inference of negligence. But in this case it is not necessary to go so far and we have not done so, although the injury here was so great, according to defendants' own evidence, that it could not have been produced by *proper* X-ray treatments. That evidence also clearly negatives the conclusion that it was caused actually in this case by natural development of the cyst without regard to treatment. That such a cyst, in the absence of any treatment, might have developed in the same or some other period of time to the same extent does not prove that it did so here or that the X rays did not cause it to do so. We hold merely that the jury was justified in considering the character of the injury in connection with the other evidence to find that negligence existed. Dr. Merritt's admission, his contradicted testimony that the injury did not exist early in September, the testimony of the X-ray experts that such an injury could not be caused by *proper* X-ray treatment, the preponderant evidence that the injury did exist in early September, these things and all the other circumstantial evidence which has been stated, when added to the character of the result and the evidence which negatived the probability that the injury was produced either by the solution or by natural development, made the plaintiff's case much more than one resting solely up-

on inference of negligence drawn exclusively from the consequence of treatment or character of the result. We have not ruled, therefore, nor do we now, that the mere fact of some injury or any injury by X rays gives a basis for inferring negligence. The evidence shows that in treating pilonidal cyst some "burn," i. e., injury, is necessary. But it also clearly shows that burn sufficient to cause necrosis, such as existed here, is not necessary and, if given, is improper treatment. In the Sweeney case there was no evidence that the injury consisted of anything more than the amount of burn which was necessary for the treatment. There was no evidence of necrosis, or of "third-degree burn," or of a condition similar to these. There was nothing more than what has been described in this case as "the severe sunburn, but not more," necessary to accomplish the purpose of the treatment. The case is therefore clearly distinguishable from the present one, not only in the absence of any evidence of some other possible cause comparable to the alcoholic solution here, but also in the scope and extent of the injury and the absence of the circumstantial evidence independent of the character of the injury which supports the verdict in this case.

 Unfortunately the case is one in which, as it comes to us, it is necessary to hold that the jury was justified in ignoring important and, in some respects, undisputed testimony. That would have been true, whatever its verdict. None could have been rendered which would not have ignored important, convincing and crucial evidence, given, as we think, by honest and honorable witnesses. It is in just such cases that courts are required to keep hands off the jury's business. We must do so here.

The judgment is affirmed.

EDGERTON, Associate Justice (dissenting).

When appellee first consulted appellants, he had a pilonidal cyst, which comprised

---

[29] Tucker Stevedoring Co. v. W. H. Gahagan, Inc., (D.C.Del.1925), 6 F.2d 407, 410, reversed, 3 Cir., 1926, 15 F.2d 935; Great Atlantic & Pacific Tea Co. v. McNew, 1934, 99 Ind.App. 229, 189 N. E. 641.

[30] Compton v. Louis Rich Construction Co., 1926, 315 Mo. 1068, 1083, 287 S. W. 474, 480; Friedman v. Shindler's Prairie House, 1928, 224 App.Div. 232,

230 N.Y.S. 44, 48, affirmed, 1929, 250 N.Y. 574, 166 N.E. 329.

[31] Barham v. Widing, 1930, 210 Cal. 206, 291 P. 173, 177; Boles v. Hotel Maytag Co., 1934, 218 Iowa 306, 253 N. W. 515, 517.

[32] Cf. Updegraff, A Technique for Liability Based on Negligence, (1941) 27 Iowa L.Rev. 2, 3.

an underlying cyst, a fistula, and also a surface ulcer. For several years it had caused discomfort, intermittently, by erupting. During and after the period in which appellants gave him X-ray treatments, he suffered severe pain. In the course of time the ulcer grew larger, and necrosis and sloughing took place. The question is whether a jury could reasonably find that appellants negligently caused appellee's sufferings by an overdose of X ray.

The testimony favorable to appellants may be summarized as follows. (1) Shortly before appellee consulted them, his pilonidal cyst had become so bad that a surgeon advised a surgical operation. (2) Surgeons testified, without contradiction, that infection and necrosis usually develop in untreated cases of pilonidal cyst. (3) Surgeons also testified, without contradiction, that surgical operations for pilonidal cysts do not always get rid of the infection, and sometimes present the same "stubbornness in healing" that appellee experienced, or a "later break down." (4) Appellant Merritt and two other X-ray experts testified, without contradiction, not only that X-ray therapy is proper treatment for a pilonidal cyst, but that the treatments which appellants gave, as recorded on their office chart, were proper treatments and could not cause harm. A disinterested expert called the treatments "very excellent." The accuracy of appellants' record was proved, and was not disputed or even questioned. Appellee said: "I cannot dispute Dr. Merritt's record." (5) The experts testified, without contradiction, that no X-ray treatments could cause such harm as appellee suffered without at the same time destroying or injuring tissue throughout the whole area which was exposed to the ray. It was not disputed that, although a square area was exposed, necrosis and sloughing were confined to a circular area in its center. (6) The experts testified, without contradiction, that if harm had been caused by the X-ray treatments, it would have reached its maximum within 90 days, or less, after they began. There was substantial, but disputed, evidence that appellee's ulcer reached its maximum size and virulence several months after the 90-day period. (7) The experts, and also a surgeon, testified that if the necrosis and sloughing which appellee suffered had been caused by X ray, the resulting sore would never have healed. Undisputed testimony showed that

nearly the whole of the diseased area had healed, and the rest was healing. (8) Surgeons not associated with appellants injected Gabriel's solution into the diseased area. There was substantial, but disputed, evidence that appellee's ulcer reached its maximum size and virulence after this injection. The X-ray experts testified that such an injection into an area previously treated by X ray is likely to cause harm, and doubtless caused the sloughing in this case.

On the other hand, the experts testified that necrosis often results from excessive use of X ray, and has to be guarded against in giving X-ray treatments. A surgeon, not an X-ray expert, who examined appellee's condition a year after the X-ray treatments, testified: "My conclusion at that time, from his history, was that it was caused by an X-ray burn." The trial occurred three years later than the time to which this testimony referred. During this interval, appellee's sore had practically healed. The surgeon's opinion *at the time of trial* was not asked or stated. And he frankly said, "I don't know anything about the X ray on a pilonidal cyst." The two surgeons who injected Gabriel's solution thought at that time, on examination and history, that the possibility of X-ray burn was worth considering, but they disclaimed expertness in the field and never diagnosed the case as X-ray burn. The first surgeon thought that X-ray burn might heal as appellee's ulcer had healed. The other two testified that the injection did not and could not cause necrosis. Appellee testified that appellant Merritt told him "that he had burned out all that pilonidal cyst, and what he had to do was to heal up the atrophic ulcer caused by that burn." Appellee's wife testified that Merritt said to her on the telephone, three and one-half years before the trial, "unfortunately that he had given Mr. Callahan too much burn, but he would be all right." Appellant testified that he made no such statements.

*Causation.* A doctor is not liable merely because his patient grows worse. To be entitled to recover, it was necessary for appellee to prove two things: That appellants' treatment caused his ulcer to grow worse, and that the treatment was negligent. X ray is a technical specialty, and evidence regarding it, to be of value, must be given by experts.[1] It appears from the record, and is common knowledge, that sur-

---

[1] Sweeney v. Erving, *infra.*

geons do not, in preparation for or in the course of general practice, become X-ray experts; specialized study and experience are required. Apart from the alleged statements of appellant Merritt to appellee and his wife, which appellant denied, the only evidence tending to show that the harm which appellee suffered *might* be caused by X-ray treatments *of any sort* came from surgeons who disclaimed special knowledge of the subject, and the only person who ever diagnosed appellee's condition as actually caused by X ray was the surgeon who said, "I don't know anything about the X ray on a pilonidal cyst." *No X-ray therapist, no surgeon, and no physician expressed, at the trial, a present belief that appellee's condition was caused by X ray.* Testimony that it was not caused by, and occurred before, the injection of Gabriel's solution cannot be translated into testimony that it was caused by X ray. On the contrary, the same surgeons who testified that Gabriel's solution was harmless testified also that they did not know how the harm arose and that infection, ulceration and necrosis such as appellee suffered often occur in pilonidal cysts which have not been treated at all. The fact that appellant himself attributed appellee's *necrosis to the solution does not* prove that it was not a spontaneous development of his ulcer but must have been caused either by the solution or by the X ray. Yet this dichotomy is basic in the prevailing opinion. Either it is founded on the erroneous[2] assumption that a party is concluded by his own testimony, or it has no foundation. Apart from the alleged statements of appellant Merritt, which he denied, there was no testimony from any source that the harm which appellee suffered was or might be caused by the particular X-ray treatments which appellants gave him. There was much testimony that those treatments could cause no harm, and that no X-ray treatments could cause the particular harm which appellee suffered. It is doubtful, in my opinion, whether a jury could reasonably find that appellants' treatment caused necrosis and sloughing, or other injury.

*Negligence.* But we need not determine that question. If appellants did cause injury to appellee, by giving him more "burn" than proved to be good for him, it does not follow that they are liable. Causation is one thing, negligence is another. As we have said in an X-ray case, "It was not enough to show merely that the treatment was injurious, but it was necessary to go further, and to show by competent witnesses that the requisite care and skill was not exercised in giving it";[3] in other words, that the treatment was negligent. "Generally speaking, no inference of negligence can be drawn from the result of the treatment of a physician or surgeon." Specifically, no such inference can be drawn from the fact that X-ray treatment results in injury. This court has ruled that the fact of injury by X ray is *"no evidence* of negligence."[4] To say that if an X-ray therapist causes harm, he *must* have been negligent, is as wide of the mark as to say that a surgeon or a lawyer who loses a case must have been negligent. I find no concession, and no testimony, to that effect; to the effect, in other words, that no acts which appellants could properly and reasonably have done in attempting to treat appellee could have produced necrosis and sloughing;[4a] although there was abundant testimony that the treatment *actually* given him could not produce such consequences.

[2] Alamo v. Del Rosario, 69 App.D.C. 47, 98 F.2d 328.

[3] Sweeney v. Erving, 35 App.D.C. 57, 63, 43 L.R.A.,N.S., 734, *affirmed on other grounds* 228 U.S. 233, 33 S.Ct. 416, 57 L.Ed. 815. The plaintiff appealed to this court, and attacked the trial court's refusal to charge that the fact of injury by x ray (1) was evidence of negligence and (2) shifted the burden of proof. We sustained the judgment of the trial court, and ruled that both of the plaintiff's propositions were unsound.

[4] Id., 35 App.D.C. at pages 61, 62, 43 L.R.A.,N.S., 734. (Italics supplied).

[4a] The prevailing opinion attributes to the X-ray men testimony that necrosis and sloughing could not be caused by proper X-ray treatment. I find no such testimony. Merritt testified that, while "any X-ray treatment of an intensity necessary to produce destruction of hair follicles will produce a burn * * * it will not destroy tissue if properly administered." I take this to mean that proper treatment for the destruction of hair follicles, while it will regularly produce a burn, will not, as a general rule, destroy tissue. Merritt did not state that it will *never* destroy tissue. Moreover, "proper treatment" is not equivalent to "proper attempts to give treatment." It is common knowledge that in the practice of medicine or surgery, as of law, faultless acts sometimes produce bad results. Dr. Merritt and the other experts made no claim that this is not true of X-ray treatments.

Negligence, technically called absence of due or reasonable care, is unreasonably dangerous conduct. If it was reasonable in the circumstances for appellants to do what they did, their conduct was not negligent, whatever results it may have produced. It is undisputed that appellee's condition called for treatment; that cysts like his, if they are not treated, are likely to lead to necrosis; that surgical treatment is not a certain cure; and that X-ray therapy is a proper form of treatment. Not only was there abundant evidence that the particular X-ray therapy which appellants administered was in the circumstances correct; *there was no evidence to the contrary.* In other words, there was no evidence of negligence. "Here there was no testimony that the instrument used by the defendant was out of repair, that the exposures were of too frequent periods or of too great duration," or of too great intensity; or that appellants failed to make reasonable inquiry into appellee's condition before or during treatment. "Neither is there any evidence of lack of skill."[5]

The Supreme Court has said that " 'When a plaintiff produces evidence that is consistent with an hypothesis that the defendant is not negligent, and also with one that he is, his proof tends to establish neither.' "[6] It follows from that premise that Merritt's alleged statement to appellee's wife, "unfortunately that he had given Mr. Callahan too much burn," does not tend to establish negligence. Giving "too much burn" is consistent not only with the hypothesis of negligence but with at least three hypotheses which do not involve negligence; (1) that an instrument which was carefully chosen, inspected, and used, gave "too much burn" by failing to function normally on this occasion; (2) that appellee was peculiarly susceptible to X ray, which could not reasonably have been discovered or anticipated, and the treatment he received, while it could not harm a normal person, proved too much for him; and (3) that there was some degree of risk that the treatment might produce "too much burn", but the risk was so slight, the probability of benefit was so great, and appellee's prospects without the treatment were so bad, that it was reasonable to take the risk.

Even if the testimony of appellee's wife to the ambiguous remark attributed to Merritt were interpreted as evidence that he was negligent, it would be no more than a scintilla of evidence. The testimony of an interested person to an alleged, and denied, extra-judicial admission, standing alone, carries little weight. Admission testimony, whoever gives it, "consisting as it does in the mere repetition of oral statements, is subject to much imperfection and mistake; the party himself either being misinformed, or not having clearly expressed his own meaning, or the witness having misunderstood him. It frequently happens, also, that the witness, by unintentionally altering a few of the expressions really used, gives an effect to the statement completely at variance with what the party actually did say."[7] Justice Story, at circuit, said that an alleged admission " 'is in all cases most unsatisfactory evidence, on account of the facility with which it may be fabricated, and the impossibility of contradicting it. Besides, the slightest mistake or failure of recollection may totally alter the effect of the declaration.' "[8] Dean Wigmore says: "The great possibilities of error in trusting to recollection-testimony of oral utterances, supposed to have been heard, have never been ignored."[9] Mrs. Callahan did not even claim to be able to quote the exact words which Dr. Merritt used. "That he had given" is, of course, a paraphrase. "Too much burn" evidently was, also, her attempt to reproduce the substance of what was said; for on cross-examination she changed it to "too much X ray." With the best will in the world such an attempt is subject, particularly after a long lapse of time, to a large margin of error.

---

[5] Sweeney v. Erving, supra, 35 App.D. C. at page 63, 43 L.R.A.,N.S., 734.

[6] Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720.

[7] 1 Greenleaf, Evidence, 15th ed., § 200.

[8] Smith v. Burnham, 22 Fed.Cas. pages 465, 466, No. 13,019.

An alleged admission by the owner of a horse that the horse was "mean" has been held insufficient to support a finding that he knew the horse was dangerous.

Webber v. McDonnell, 254 Mass. 387, 150 N.E. 189. A defendant's alleged statement that "it was my fault" has been held no bar to the direction of a verdict in his favor. Binewicz v. Haglin, 103 Minn. 297, 115 N.W. 271, 272, 273, 15. L.R.A.,N.S., 1096, 14 Ann.Cas. 225. Cf. Jones v. Harris, 122 Wash. 69, 210 P. 22.

[9] Wigmore, Evidence, 3d ed., Vol. VII,. p. 468, (§ 2094).

A scintilla of evidence of negligence is not enough to sustain a plaintiff's burden of proof and create a jury question.[10] The testimony of appellee's wife, if interpreted as evidence of negligence, is in conflict with the entire mass of evidence on that subject. The propriety of appellants' undertaking to treat appellee by X ray is clear. The testimony to the correctness of their treatment is overwhelming. No reasonable jury could regard it as outweighed by the interested and disputed testimony of appellee's wife to her understanding and recollection of the substance of an ambiguous remark alleged to have been made by Merritt, over the telephone, three and one-half years before the trial. "Where the evidence upon any issue is all on one side or so overwhelmingly on one side as to leave no room to doubt what the fact is, the court should give a peremptory instruction to the jury."[11] It follows that appellants' motion for a directed verdict should have been granted.

---

[10] Jackson v. Capital Transit Co., 69 App.D.C. 147, 99 F.2d 380.

[11] Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 233, 74 L.Ed. 720.